C. L. HUNT, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hunt v. Commissioner
Docket Nos 758-85, 759-85; 760-85, 761-85; 762-85, 763-85; 10239-87; 10240-87
United States Tax Court
T.C. Memo 1989-335; 1989 Tax Ct. Memo LEXIS 439; 57 T.C.M. (CCH) 919; T.C.M. (RIA) 89335; July 13, 1989; As corrected January 3, 1990 *439 Mr. and Mrs. Hunt transferred large sums of money to their children between January and the end of March 1980 to enable the children to make margin calls in the silver and/or gold commodities markets or to take delivery of silver. The children had negative net worths on March 17, 1980. On March 27, 1980, their commodity accounts were involuntarily liquidated. After March 27, 1980, Mr. and Mrs. Hunt transferred additional sums to cover deficits in the commodities accounts of the children. On December 28 or 29, 1980, Mr. and Mrs. Hunt demanded repayment of the total amount outstanding. On December 31, 1980, the children transferred title to a majority of their assets to Mr. Hunt. Held: The transfers by Mr. and Mrs. Hunt to the children up to and including March 14, 1980, were bona fide loans. The notes executed on those loans represented full and adequate consideration for the funds. Held further: No transfers were made on March 15 or 16, 1980. Transfers made on or after March 17, 1980, were gifts subject to tax under sec. 2501, I.R.C. 1954. These transfers were not ordinary and necessary expenses incurred for the management, conservation *440 or maintenance of property held for the production of income. Held further: The loans made up to and including March 14, 1980, were worthless on December 31, 1980. Mr. and Mrs. Hunt are entitled to a bad debt deduction on the loans to the extent not repaid. Held further: The children have income from the relief on indebtedness to the extent of their solvency on December 31, 1980. Held further: Mr. and Mrs. Hunt must accrue interest on the loans through March 14, 1980. They are entitled to a bad debt deduction to the extent the interest on the bad debts is uncollectible. Joyce R. Scruggs, James D. Penny, James S. Meyer, Ewing Werlein, Jr., Elaine Drodge Koch, David T. Harvin, Lawrence J. Fossi, Mary Nell S. Browning, and Thomas P. Marinis, Jr., for the petitioners. Deborah Butler, Rebecca W. Wolfe, Emron M. Pratt, Jr., and David L. Miller, for the respondent. PARR
*444 PARR, Judge: Respondent determined the following deficiencies against the various petitioners:
Taxable Period
Docket No.
Petitioner
Type of Tax
Ending Deficiency
758-85
C. L. Hunt
Gift
Mar. 31, 1980
$ 43,015,990.57
Jun. 30, 1980 13,147,128.08
759-85
Albert D. & Mary H.
Huddleston
Income
Dec. 31, 1980 53,201,432.51
760-85
N. B. Hunt
Gift
Mar. 31, 1980 43,015,987.07
Jun. 30, 1980 13,152,627.67
761-85
N. B. & Caroline
Hunt
Income
Dec. 31, 1980 40,812,234.82
762-85
Thomas J. &
Elizabeth H. Curnes
Income
Dec. 31, 1980 36,672.703.94
763-85
Houston B. Hunt
Income
Dec. 31, 1980 11,977,351.74
10239-87
N. B. Hunt
Gift
Dec. 31, 1980 50,703,852.52
10240-87
C. L. Hunt
Gift
Dec. 31, 1980 50,714,849.03
In his answer, respondent also alleged additional deficiencies in gift tax for the taxable period ending June 30, 1980, against Caroline and Nelson Bunker Hunt i the respective amounts of $ 752,539.92 and $ 758,039.30. There are several questions we must answer in order to reach final decisions in these docketed cases. The initial and primary issue is the appropriate *445 character of transfers made during 1980 from Nelson Bunker Hunt (referred to as Bunker Hunt or Mr. Hunt) and Caroline Hunt (referred to collectively as Mr. and Mrs. Hunt) to their children and their sons-in-law Mary H. and Albert D. Huddleston (referred to as Mary, Albert and collectively as the Huddlestons), Elizabeth H. and Thomas J. Curnes (referred to as Betsy, Tom and collectively as the Curneses) and Houston B. Hunt (Houston). As a group Houston, the Curneses and the Huddlestons are referred to as the children or the Hunt children. Mr. and Mrs. Hunt made almost all of the transfers at issue in these cases in order for their children to meet margin calls or to repay deficits in their commodities accounts from investments in silver and gold futures. The children traded on the Commodity Exchange in New York (COMEX), at the Chicago Board of Trade (CBT) and, in the case of Albert, on the London Metals Exchange (London Exchange). The Hunts dealt with several brokerage houses when they traded in gold and silver. Bache Halsey Stuart Sheilds, Inc. (Bache), Bache Halsey Stuart (London) Limited (Bache (London)) and Cargill Investor Services, Inc. (Cargill) are of particular importance *446 to these cases because the transfers were made to meet margin calls or cover deficits with these brokers. After we decide the character of the transfers, i.e., whether they are gifts or loans, we must also determine the tax consequences to all the parties resulting from that initial decision. The following list sets forth the issues to be addressed depending on whether the transfers are characterized as gifts or loans.
1. If all of the transfers made by Mr. and Mrs. Hunt to or on behalf of the Huddlestons, the Curneses and Houston are determined to be gifts, then there are no additional issues to be addressed. The children would not be liable for the deficiencies determined against them; Mr. and Mrs. Hunt would not be entitled to a bad debt deduction resulting from the failure to repay the amounts transferred; and Mr. and Mrs. Hunt would be liable for the deficiencies in gift tax determined for the taxable periods ending March 31, 1980, and June 30, 1980. 2. If any part of the transfers made by Mr. and Mrs. Hunt to or on behalf of the Huddlestons, the Curneses and Houston are determined to be bona fide loans, we must also decide: a. Whether the "notes" received in exchange *447 for the funds constituted full and adequate consideration for the loans. b. At what point in time, if ever, the general character of the transfers changed from loans to gifts.
c. Whether those transfers which are not loans qualify as "ordinary and necessary " expenses incurred by Mr. Hunt for the management, conservation or maintenance of his property held for the production of income, deductible under section 212. [2]
d. Whether the bona fide loans were worthless on December 31, 1980, such that Mr. and Mrs. Hunt are entitled to a nonbusiness bad debt deduction under section 166. e. Whether the children were insolvent after their transfer of assets to Mr. and Mrs. Hunt on December 31 , 1980, such that the cancellation of the children's indebtedness did not result in income to the children. f. Whether the cancellation of indebtedness by Mr. and Mrs. Hunt resulted in a taxable gift; and whether the statute of limitations bars this assessment.
g. Whether Mr. and Mrs. *448 Hunt must include accrued interest on the transfers as part of their 1980 taxable income.
FINDINGS OF FACT Some of the facts have been stipulated. To the extent stipulated, those facts and the attached exhibits are found and incorporated by this reference. Some of the more important stipulated facts and the additional facts, as we find them, are set out below. Background
Mr. and Mrs. Hunt are husband and wife and are the parents of four children -- Ellen, Mary, Betsy and Houston. Ellen is married to Paul W. Flowers and is not a party to this litigation. Mary is married to Albert D. Huddleston. Both Mary and Albert are petitioners in these consolidated cases. Betsy is married to Thomas J. Curnes. Both Betsy and Tom are also petitioners in these cases. Houston Hunt is now married, but was not during the year in question. Therefore, although he is a party to these suits, his wife is not. Mr. and Mrs. Hunt resided in Dallas, Texas when they filed their petitions in docket Nos. 758-80, 760-80, 761-80, 10239-87 and 10240-87. Mr. and Mrs. Hunt were accrual basis taxpayers with a calendar year end during 1980. They timely filed their Federal income tax returns for the *449 year ending December 31, 1980. Similarly, they each filed a timely Federal gift tax return for the period ending December 31, 1980. All of the children were also accrual basis taxpayers and filed timely Federal income tax returns for their taxable year ending December 31, 1980. During 1980, Mary and Albert Huddleston and Betsy and Tom Curnes resided in Dallas, Texas. Houston Hunt listed his address as Dallas, Texas, but was a student at the University of Tulsa during 1980. Commodities Trading
In the United States, commodities are traded on exchanges. The exchanges that concern us are primarily the Commodities Exchange (COMEX) in New York, New York and the Chicago Board of Trade (CBT) in Chicago, Illinois. Commodities are traded for the current or "spot" month as well as for months in the future. The investor purchases a "contract" which has standardized terms for a specified amount and type of each commodity. In practice, the exchanges set all the terms of the contract except the price. After the exchange authorizes trading, buyers and sellers, or their agents, meet on the floor of the exchange and try to agree on trades. After a buyer and seller agree to trade a *450 commodity for a future month, the buyer does not actually own that commodity. Instead, the buyer has an obligation to buy a specified amount of that commodity at the agreed upon price in the month of the contract. An investor who purchases the obligation holds a "long position." Similarly, the seller does not necessarily own the actual commodity and holds a "short position." While the positions necessarily offset one another, there is not a sale between the parties. Instead, each exchange operates a clearinghouse which interjects itself into each and every transaction. That is, the clearinghouse is the party who buys from the investor in the short position and who also sells to the investor acquiring the long position. Thus, the clearinghouse guarantees performance on every contract. In order to protect itself, the clearinghouse requires the members trading on the exchange to deposit an initial margin. Members of the exchanges are typically brokerage houses. The margins do not represent payment for the goods purchased, but rather are "good faith" deposits. The initial margin is the minimum amount required in order for a member to establish a position on the exchange. If during *451 the course of trading the member experiences losses, the clearinghouse will require additional deposits to ensure that the losses do not exceed the initial margin. At the end of each trading day COMEX and CBT announce the settlement price, by maturity date, for all the commodity futures traded on that exchange. Settlement prices for gold and silver are determined by a committee of exchange officials and generally are based upon the observed contract price during the last few minutes of trading each day. The settlement prices are reported the following business day in several newspapers, including The Wall Street Journal. Based on the settlement price the clearinghouse may either require additional margin deposits or remit funds to a brokerage house. The member brokerage firms that are subject to these margin requirements typically impose similar requirements upon the clients for whom they are trading. If a trader is dealing with a brokerage firm, the firm will require an initial deposit in the customer's equity account equal to or exceeding the firm's initial margin requirement. Thereafter, the firm sets a maintenance margin requirement. The maintenance margin represents the *452 minimum amount which must be deposited in the customer's account after trading has begun. If the customer experiences losses based upon the daily settlement price he will be called upon to make additional deposits. Conversely, if the customer experiences gains his equity account will reflect the amount of the gain. The trader is free to withdraw the amount of gain earned, leave the amount in his equity account, or use the amount to acquire additional positions in the marketplace. If the customer is unwilling or unable to meet the maintenance margin requirements, the brokerage house has the right to liquidate all future positions in the account and use the proceeds to cover any deficit. There are generally two types of traders in the commodities market, hedgers and speculators. Hedgers typically have both long and short positions and, as the name implies, are hedging against price fluctuations. Conversely, the speculator bears the risk of price fluctuation with the hope of making a profit. The exchanges have rules regulating trading in the market. The period of 1979 and 1980 saw many price fluctuations and rule changes, especially concerning the trading of silver futures. *453 The Commodities Market During 1979 and 1980
Price Fluctuations and Rule Changes
There were dramatic changes in the silver and gold commodities markets during 1979 and 1980. Most dramatic during that time were the drastic price changes and the new rules imposed by the exchanges. While Bunker Hunt had invested in silver as far back as 1973, his four children did not enter the silver market until February 1979. At that time, with a loan from First National Bank of Dallas, guaranteed by their father, Betsy, Mary, Houston and Ellen each purchased more than 100 long futures contracts. Each contract represented 5,000 troy ounces of silver. When the Hunt children entered the market, silver was trading at approximately $ 7.40 per ounce. On March 27, 1980, the day all of the Hunts were liquidated, silver was trading at approximately $ 10.70 per ounce. The $ 3.30 difference in price from when the children first entered the market and when they were liquidated thirteen months later does not begin to tell what actually transpired during that period, how many millions of dollars Bunker Hunt and his children earned; and inevitably the greater amount of money Bunker Hunt and his *454 children lost due to their trading in silver and gold. When 1979 began the initial margin requirement for silver was $ 1,000 on COMEX and $ 750 on CBT. By mid-February an initial margin requirement had risen to $ 1,500 on both exchanges. In February 1979 the spot price of silver was $ 7.40 per ounce. The Hunt children held approximately 3,000,000 ounces of silver (approximately 600 contracts). By the end of February 1979 Bunker Hunt held 22,410,442.84 ounces of silver. In July, Mary's husband Albert entered the silver market. By then the initial margin requirement had risen higher. On September 18, 1979 the initial margin requirement on CBT was $ 2,500. The same day on COMEX the margin requirement was $ 7,500 at the opening of trading and rose to $ 20,000 by noon. On September 19, 1979, CBT had a similar rise in initial margin of $ 4,500 for open accounts, $ 30,000 for new positions in the spot month and $ 20,000 for new positions in all other months. By the end of September the spot price of silver had risen to $ 16.48 per ounce on CBT and $ 16.40 per ounce on COMEX. On October 18, 1979, CBT delayed the opening of the silver market for two hours. On October 25, 1979, CBT *455 limited investors to 600 net long or short contracts in all months combined. Investors were given until February 1, 1980, to comply (the deadline was subsequently extended until April 1, 1980). On October 26, 1979, COMEX again raised the initial margin requirement to $ 50,000. On October 30, 1979, the margin requirement dropped back down to $ 30,000 and to even lesser amounts for those investors with 250 or fewer contracts. By the end of the year Mr. Hunt held silver futures equal to 28,227,789.90 ounces. He also had silver bullion equal to 798,350 ounces. The spot price of silver on COMEX was $ 34.00 per ounce and was $ 34.75 per ounce on CBT. During this same time futures prices were locked limit up at $ 1.20 per ounce on CBT and at $ 1.00 per ounce on COMEX. That is, no matter how drastically the current or spot price of silver fluctuated, the future price could not fluctuate by more than the specified amount on any given day. On January 7, 1980, COMEX also implemented rules limiting the number of futures contracts an investor could own. The COMEX rule, called Silver Rule 7, limited investors to 2,000 net futures contracts in all months combined. It also limited an investor *456 to 500 gross futures contracts in the spot month and 500 gross futures contracts in the next month. The effective date for both these limits was February 18, 1980. Silver Rule 7 also imposed reporting requirements for all accounts of 100 or more silver futures contracts. Traders with over 2,000 contracts were required to reduce their positions by at least 10 percent of the excess each month and to be below the limit by January 31, 1981. January 9, 1980, through January 17, 1980, saw the most dramatic increase in silver prices. On COMEX the price rose steadily from $ 33.60 per ounce on the 9th to $ 48.70 an ounce on the 17th. A similar rise occurred on CBT from $ 33.40 per ounce to $ 48.70 per ounce. The prices of gold had followed the same path as silver and peaked on January 21, 1980, at $ 825 per ounce. The beginning of the end occurred on January 21, 1980. On that day the spot price of silver began to fall and it never recovered to the high of January 17. On January 21, 1980, COMEX did not open until 1:00 p.m. When the exchange did open silver trading was limited, with certain exceptions, [3] to liquidation only. The following day CBT also approved a rule limiting trading *457 to liquidation only. On January 21, 1980, Houston owned 1,550,000 ounces of silver. Mary and Albert owned 3,700,000 ounces of silver and Betsy and Tom owned 675,000 ounces of silver. At the same time Betsy owned 2,000 long gold contracts, Houston owned 390 long gold contracts and Albert bought 425 long gold contracts. *458 On January 22, 1980, there was a rapid decline in the price of both silver and gold. On CBT, the spot price of silver sank from $ 47.38 on January 21, 1980, to $ 33.50 on January 22, 1980. COMEX witnessed a similar decline. The spot price of silver fell from $ 44.00 per ounce on the 21st to $ 34.00 per ounce on the 22nd. For gold, the spot price dropped from a high of $ 825 per ounce on January 21, 1980 to $ 682 per ounce on January 22, 1980. CBT and COMEX modified the trade-for-liquidation rule throughout January and February. On January 24, COMEX allowed delivery against new positions in the spot month if the trader was unable to switch out of those positions because deferred contracts were at the limit. On January 25, 1980, CBT allowed new positions in the spot month contracts if they were closed out the same day. On January 31, 1980, COMEX amended the rule for September 1980 contracts and more distant contracts to permit new gross positions in all months combined up to 200 contracts, net positions in all months up to 50 contracts, and gross positions in any one month up to 50 contracts. During January, Bunker Hunt had amassed silver futures in excess of 44,350,000 ounces.
*459 On February 14, 1980, COMEX terminated the trade-for-liquidation rule. Contract limits were still in effect and were modified to 20 percent of the positions permitted under Silver Rule 7. That day the spot price of silver was $ 36.20 per ounce on COMEX and $ 36.95 per ounce on CBT. On March 6, 1980, the futures price for silver was locked limit down on COMEX at $ .75 per ounce and on CBT at $ .80 per ounce (i.e., the daily downward price fluctuation was limited to those amounts). Although the amount of the limit varied, both silver exchanges were locked limit down for the duration of March. On March 7, 1980, the spot price of silver was $ 32.90 per ounce on COMEX and $ 32.15 per ounce on CBT. By March 14, 1980, the price had plunged to $ 21.00 per ounce on COMEX and $ 20.70 per ounce on CBT. Then, on March 17, 1980, the price of silver fell below $ 20 on both exchanges, to $ 17.40 and $ 17.30 per ounce on COMEX and CBT, respectively. The spot price of silver fluctuated the next few days to over $ 20 per ounce. However, on the 26th of March, the spot price sank to $ 15.80 per ounce in COMEX and $ 15.70 per ounce on CBT. On March 27, 1980, Silver Thursday, all of the Hunts' *460 silver positions were involuntarily liquidated because they could not meet margin calls. This liquidation, at a minimum, affected Houston, Mary, Albert, Betsy, Tom, Ellen, Bunker Hunt and Bunker Hunt's brother Herbert. Because of the massive liquidations, on March 17, 1980, the spot price of silver plummeted to $ 10.80 per ounce on COMEX and $ 10.65 per ounce on CBT. The Hunts' Interests In Silver and Gold
Bunker Hunt's interest in silver and gold predated 1979 and 1980. His interest was fueled by his belief that precious metals, particularly gold and silver, promised significant appreciation and were a hedge against inflation. Moreover, Mr. Hunt learned that the world consumption of silver was approximately 400 million ounces per year, while silver mining yields approximately 200 million ounces per year. His beliefs were also influenced by a desire to invest in materials which could not be easily expropriated by any new or existing governments. Mr. Hunt was particularly sensitive to this aspect of his investment after Colonel Moamar Gadhafi, in 1973, expropriated a large oil field in Libya in which Mr. Hunt owned an interest. Having concluded that silver and gold were *461 good hedges against inflation, that the metals were fairly mobile, that the metals could not be easily expropriated, and that silver mining occurred at rather lower levels in comparison to the consumption of the product, Mr. Hunt began investing in silver. He purchased silver bullion by acquiring silver futures contracts on both COMEX and CBT. In 1973 Mr. Hunt acquired and actually took delivery on a large number of silver futures contracts. At year end, he already possessed approximately 15-20 million ounces of silver bullion and coin and maintained long silver positions futures contracts on another 690,000 ounces of silver. Mr. Hunt's interest and investment in silver continued between 1973 and 1979. Although the amount of his investment varied during that time, generally his acquisition of silver and gold continued to grow during those years. Mr. Hunt was also bullish on gold, and during the years between 1973 and 1979 he acquired gold coins and capital stock in gold mines. By the beginning of 1980, Mr. Hunt held approximately 28 million ounces of silver bullion and coin, 10,000 net long silver futures contracts (each contract representing 5,000 ounces of silver) and gold *462 mining stocks with a fair market value in excess of $ 67 million. Albert Huddleston, Mary's husband, had been interested in silver since his childhood when, at his father's insistence, he screened thousands of coins in search of those with 90 percent silver content. Albert's father had long invested in the stock of silver mining companies, and Albert's first purchase of stock was in one silver producing company. Albert believed that gold and silver were excellent investments. In the summer of 1979, Albert and Mary opened a joint commodity account and purchased long positions in silver and gold through that account. Later, in January of 1980, they also purchased silver "forward contracts" (similar to futures contracts) on the London Metals Exchange. Tom Curnes, Betsy's husband, was the last of the children to enter the futures market. In December of 1979, after watching his wife's success in trading, he purchased 25 long silver positions. During this time, Bunker Hunt, his brother Herbert, and IMIC (International Metals Investment Company) which was owned 50 percent by two Arab sheiks and 25 percent each by the Lyda Hunt-Bunker and Lyda Hunt-Herbert trusts, also traded heavily *463 in silver. Bunker Hunt and Herbert Hunt each held 50 percent of IMIC preferred stock, and influenced the decisions of IMIC. By the end of January 1980, according to Bunker Hunt, he owned, in bullion or futures, 100,000,000 ounces of silver. His brother Herbert may have owned a similar amount, and we are not certain how much IMIC owned. The significance of this is clear in light of Bunker Hunt's testimony that only 200 million ounces were mined annually, but 400 million ounces were annually consumed. As the supply of silver shrank, prices soared. In February 1979 the spot price of silver was $ 7.40 per ounce. By the end of September the price had more than doubled to almost $ 16.50 per ounce. By year end the price had almost doubled again to $ 34.00 per ounce. During the beginning of 1980, as the Hunt holdings increased, the price continued to climb. The price of silver peaked both on CBT and COMEX on January 17, 1980, at $ 48.70 per ounce. Perhaps in response to the dramatic and accelerated rise in prices, both CBT and COMEX instituted temporary rules limiting trading to liquidation only. Initially, after the rules changes were announced the spot price of silver fell dramatically. *464 Overnight the price dropped $ 10 per ounce on COMEX and $ 13.88 per ounce on CBT. Between January 22, 1980, and March 7, 1980, the spot price of silver fluctuated generally between $ 32.00 and $ 39.00 per ounce. During the rest of March, however, the price of silver plunged from below $ 30 per ounce to as low as $ 17.30 per ounce on March 17, 1980, and as low as $ 10.80 per ounce on March 27, 1980. With the rise in gold and silver prices during the last eight months of 1979, payment by the brokerage houses of daily settlements flowed almost continuously into the bank accounts of the children or, in the case of Albert Huddleston, into his securities account. In some instances, the children used the funds from the daily settlements to acquire additional futures positions in gold and silver. Any funds in the First National Bank in Dallas were then routinely invested in short-term interest bearing obligations. Over the course of 1979, as a result of their silver and gold investments, the net worth of each child increased dramatically. A conservative reckoning indicates that on December 31, 1979, Albert and Mary Huddleston had a net worth of almost $ 39 million, Houston Hunt had *465 a net worth of approximately $ 30 million, and Tom and Betsy Curnes had a net worth of more than $ 7 million. Most of their holdings were in highly liquid investments such as treasury bills, overnight deposits, money market accounts, and publicly traded stock. Of course, the brokerage houses held liens on their property to secure any indebtedness or obligations to them. From the final trading day of 1979 through the close of trading on January 21, 1980, the per ounce spot price of silver jumped from $ 34 to $ 47, and the per ounce spot price of gold rocketed from $ 533 to $ 825. Futures prices, which are generally higher than spot prices by an amount comprising interest, carrying and storage costs, were locked "limit up" during much of that period. During the first three weeks of 1980, remittances from daily futures contract settlements continued to flow into the bank or securities accounts of the children. A conservative computation of the children's net worths as of the close of business on January 21, 1980, using settlement prices even though silver futures prices were locked "limit up," indicates that Albert and Mary had a net worth of approximately $ 64 million, Houston *466 of $ 57 million and Betsy and Tom of $ 42 million. The Role of Hunt Energy Corporation (HEC)
HEC is a Delaware corporation, which was wholly owned by Hunt Industries in 1980. Hunt Industries, in turn, is a general partnership composed of the Lyda Hunt-Bunker, Lyda Hunt-Herbert, Lyda Hunt-Margaret, Lyda Hunt-Caroline and Lyda Hunt-Lamar Trusts settled pursuant to the Last Will and Testament of Lyda Bunker Hunt, the mother of the five Hunt children whose names appear in the trusts' names. HEC is primarily a service corporation. While it made some minor investments, its primary purpose during 1979 and 1980 was to provide a variety of services to approximately 150 different individuals, partnerships, corporations and trusts which were related to the Hunt family in one way or another. The user paid a fee for the services which was based on the relative portion of services rendered and was calculated to allow HEC to recoup its overhead cost and make a small profit. The approximately 550 employees of HEC provided a variety of services including accounting, cash management, tax return preparation, ad valorem tax rendering, internal audit, legal, engineering and geological services. *467 From May 22, 1979, until May 27, 1980, the officers of Hunt Energy Corporation were as follows: Chairman of the Board
Bunker Hunt
President
W. H. Hunt
Vice President
Lamar Hunt
Vice President and Secretary
Tom Hunt
Vice President and Treasurer
J. A. Goodson
Vice President
James L. Parker
Vice President - Administration
Thomas E. Whitaker
Assistant Treasurer
C. H. Mercer
Assistant Secretary
Julie Sheerin
Its officers elected on May 27, 1980, to serve until the next Annual Meeting were as follows: Chairman of the Board
Bunker Hunt
President
Tom Hunt
Vice President
W. H. Hunt
Vice President
Lamar Hunt
Vice President and Treasurer
James L. Parker
Vice President - Administration
Thomas E. Whitaker
Secretary
Julie Sheerin
Assistant Secretary
Inez Haygood
Assistant Treasurer
C. H. Mercer
Bunker Hunt, Betsy, Mary and Houston all used the HEC services on a regular basis during 1979 and 1980. They each maintained their bank accounts through and made use of other services provided by the HEC treasury department. Charles Mercer (Mercer), who was assistant treasurer, oversaw the day-to-day operations at HEC. Mercer had *468 signature authority on the 150 to 200 bank accounts maintained by HEC. This included the bank accounts for BunkerHunt and the Hunt children. Generally speaking, Mercer serviced the Hunt family accounts on the basis of standing orders and on occasion, special instruction. He was authorized to move money between family bank accounts in order to provide financing for various deals. Mercer reported to J. A. Goodson through mid-1979, and thereafter to James Parker (Parker), chief financial officer of the company in 1980, responsible for arranging the financing for BunkerHunt's various silver investments. Mercer was also generally required to obtain, and did in fact obtain, the consent of both parties to a transfer transaction. However, in some cases, Mercer did not obtain the consent until after the transfer was made. At all times, HEC and the parties treated the transfers as loans. Before 1980, in fact, all of the sums transferred between the parties had been repaid. With minor exceptions, for the transfers made in 1980 Mercer always got approval from James Parker or BunkerHunt before he transferred the funds. On one occasion BunkerHunt was out of the country and Mercer *469 got approval from his brother Herbert Hunt, who approved the transfer in question after speaking with BunkerHunt on the telephone. Julie Sheerin (Sheerin) was James Parker's secretary. At his request or Mercer's she prepared check request forms, obtained the proper signatures if required and had checks drawn for the transfers of funds. She maintained a loan book in which she kept track of family members' notes, and automatically made interest payments when they came due. When a note was coming due, Mercer was authorized and would determine whether the note should be renewed or paid from the client's business account. If there were not sufficient funds available in the bank account, the note was automatically renewed by Sheerin. A new note was sent to the borrower to be signed and returned to HEC. If sufficient funds were available the note was paid. In any event, interest was paid when it was due, unless Sheerin was told not to make the payment or there were insufficient funds. The treasury department of HEC handled the daily settlements on the various commodity accounts of BunkerHunt, Ellen, Mary, Betsy, Tom, and Houston in accordance with instructions from the account *470 owners. The children had instructed their brokers to call Mercer to confirm their trades whenever they acquired or liquidated futures positions. At HEC, the trade would be recorded, and any monies required as margin for the new positions would be disbursed, usually through wire transfer. When daily settlements resulted in remittances, the amounts of the remittances would be noted. In accordance with standing orders from the account owners, any excess funds would generally be invested in short term interest-bearing investments such as Eurodollar deposits or bank repos. When additional margin was required, Mr. Hunt and the children (except Albert) instructed the brokers to communicate directly with Mercer, whose duty it was to wire funds from the appropriate bank account to the brokerage house to meet the margin calls. Mr. Hunt and the children (except Albert) directed that copies of their monthly commodity account statements be sent to HEC, where they were verified with HEC's records. Mercer also kept a separate book in his office of the records of the commodity investments of Ellen, Mary, Betsy, Tom, and Houston. The book reflected each acquisition and disposition of a futures *471 contract during 1979 and 1980, along with the contract price. History of Intra-family Loans
The Hunt family established its own history of lending to each other in 1977. HEC maintained records of the loans among the Hunt family members. Mercer and Sheerin transferred monies between lender and borrower, and prepared promissory notes evidencing the loans. In 1977, Mr. Hunt started his children in the soybean commodity market. The children may not have been aware that Mr. Hunt opened accounts in their names. Mr. Hunt started Houston with 750,000 contracts and each of his three daughters with 250,000 contracts for soybeans. The soybean trading was very successful and each of the children made an enormous profit. However, as a result of their soybean trading, the Commodities Futures Trading Commission filed suit against the group of Hunt family members for violation of the 3 million bushel per group limit on soybeans. The Hunt family members were found to have violated the limit. The end result is that the Hunts signed a consent injunction and paid a fine of $ 500,000, but they did not have to disgorge their profits. Commodities Futures Trading Commission v. Hunt, 591 F.2d 1211 (7th Cir. 1979). *472 After the soybean episode, procedures at HEC were changed so that Parker or Mercer checked with BunkerHunt before a transfer was made to the children's account in the form of a loan. Mercer also was required to obtain the permission of the children. That is, Mercer acted as a go-between, securing approval of both the lender and borrower in each situation. Starting at the time the Hunts began trading in soybeans and before they made any transfers relating to silver, the following transfers were made among the family members and represent loans that were repaid in full with interest: Transfers from Bunker Hunt in 1977
Betsy   Ellen   Mary    Houston  3/1/77  $ 750,000.00
3/2/77  400,000.00
3/3/77  300,000.00
3/4/77  $ 175,000.00
$ 225,000.00
$ 200,000.00
3/9/77  150,000.00
3/11/77  270,000.00
3/14/77  175,000.00
6/7/77  25,000.00
40,000.00
575,000.00
6/8/77  80,000.00
80,000.00
80,000.00
6/9/77  1,175,000.00
6/10/77  70,000.00
90,000.00
90,000.00
1,160,000.00
6/13/77  90,000.00
90,000.00
90,000.00
160,000.00
6/14/77  50,000.00
55,000.00
50,000.00
255,000.00
6/15/77  581,075.89
7/20/77  1,964.08
1,676.99
1,925.94
8/9/77  1,707.71
1,379.31
1,642.03
15,763.50
9/15/77  1,738.32
1,404.03
1,671.46
16,069.55
11/3/77  1,746.48
1,410.61
1,679.31
16,144.88
11/18/77  1,911.74
1,544.11
1,838.21
17,693.91
12/6/77  100,000.00
12/15/77  1,897.46
1,532.56
1,824.48
17,515.01
12/19/77  100,000.00
12/30/77
804,646,34
Transfers from Bunker Hunt in 1978
Betsy   Ellen   Mary    Houston  1/11/78  $ 100,000.00
1/19/78  1,960.71
1,583.65
1,885.30
11,092.84
2/13/78  150,000.00
2/16/78  150,000.00
2/20/78  2,015.79
1,628.14
1,938.26
10,173.14
2/22/78  50,000.00
3/17/78  50,000.00
100,000.00
3/20/78  1,828.09
1,476.53
1,757.78
3/20/78  50,000.00
7,345.00
3/23/78  50,000.00
4/7/78  50,000.00
4/12/78  1,772.85
1,458.96
1,732.67
6,830.22
4/21/78  200,000.00
160,602.67
200,753.33
802,611.56
5/12/78  828.98
6/1/78  10,067.33
75,000.00
25,000.00
100,000.00
6/1/78  15,000.00
8/4/78  15,000.00
15,000.00
25,000.00
150,000.00
10/17/78  50,000.00
50,000.00
50,000.00
225,000.00
11/14/78  20,000.00
12/11/78  10,000.00
01/10/79  20,000.00
Transfers to Bunker Hunt From
Betsy   Ellen   Mary    Houston  3/7/77  300,000.00
3/8/77  300,000.00
3/17/77  175,000.00
225,000.00
200,000.00
1,448,805.87
5/31/77  1,500,000.00
6/03/77  1,000,000.00
6/06/77  550,000.00
550,000.00
600,000.00
1,400,000.00
7/6/77  900,000.00
7/8/77  1,500,000.00
12/4/78  758.76
3,793.81
1,264.60
5,058.42
2/5/79  770.83
770.83
1,284.72
7,708.33
4/17/79  2,493.15
2,493.15
2,493.15
11,219.18
5/14/79  20,991.78
6/7/79  747.95
3,739.73
1,246.58
4,986.30
6/12/79  10,498.63
7/11/79  20,991.78
7/17/79  280,609.59
8/8/79  747.95
747.95
1,246.58
7,205.48
8/28/79  82,273.97
143,720.55
102,575.34
203,013.70
*473 Three of the above transfers were non-interest bearing obligations, which were intended to be outstanding for only a short time and were recorded as "advances." These advances were in fact repaid within two weeks. In all instances, the lender fully expected repayment, the borrower fully understood that his or her repayment obligation was absolute and unconditional, and neither party contemplated any cancellation or forgiveness of the indebtedness. Transfers Between January 24, 1980 and March 27, 1980
Beginning in January 1980 large amounts of cash were moved from BunkerHunt's bank accounts to those of his children or funds were wired directly to the children's brokerage accounts to meet margin calls on their silver commodities. Ellen had borrowed money from and loaned money to her father, not only for the soybeans but also for silver. She repaid all of the silver loans. (She is not a party to this action because she repaid all the transfers made to her in 1980.) She did her own silver trading, and although she did not work outside the home during 1980, she understood the market and acted on her own behalf in trading. Her husband apparently was not involved in the silver *474 market. Betsy, Tom and Houston also traded their own accounts. Mary had some bullion and apparently a small number of positions which she controlled, but Albert made most of the Huddleston investment decisions. Houston operated out of the Pi Kappa Alpha fraternity house where he lived in 1979 as a college student in Tulsa, Oklahoma. The trading strategies of the children were markedly different. For instance, Ellen and Mary confined their purchases to silver and did not significantly increase the numbers of their contracts. Houston traded much more frequently, and at one point owned more than 300 net long silver positions. Near the end of 1979, Houston purchased a number of long gold positions, each representing a contract for 100 troy ounces of gold under rules promulgated by COMEX. In early 1980, Betsy also acquired net long gold positions. Albert and Mary actually took delivery of silver bullion in several instances, and Houston and Betsy sometimes used "spreads," which are offsetting futures positions in different months, in order to convert short term capital gain to long term gain. By the beginning of 1980 all the children were heavily invested in silver futures. *475 Houston and Betsy had originally hedged their positions, but as the price of silver continued to rise they removed their short positions. At the beginning of the year, each of the children had a net worth in the multi-millions. Ellen was the most conservative, and sold many of her positions when the price of silver reached $ 20 per ounce. She is the only one whose accounts were not closed at a deficiency and who fully repaid her father. On January 21, 1980, when COMEX instituted the trade-for-liquidation-only rule, there was a dramatic overnight decline in the price of silver. Each of the children received margin calls. During the period after the "liquidation only" rule was enacted the market was often "limit up" or "limit down," usually between $ .80 and $ 1.20 per ounce per day. Thus, if the actual value had fallen lower than limit, it was impossible to sell one's shares. Between Jauary 22, 1980, and March 27, 1980, the market generally continued to fall. However, there were occasions when the price of silver rose temporarily. During these times the broker would remit any amounts in the children's accounts, as determined by the settlement price, in excess of the required *476 margin. Thus, some days the children received money, but more often they were required to pay additional money. Parker, whose responsibilities included obtaining financing for the children who used HEC's services, was advised by Mercer when Betsy needed $ 4.5 million in order to meet a margin call on January 24, 1980. Parker was aware that banks were virtually precluded from making loans for use in futures transactions by reason of a credit restraint program announced several months earlier by the Federal Reserve Board. Parker therefore asked BunkerHunt who had excess funds in his bank account, whether he would be willing to loan the money to Betsy. Parker and Mr. Hunt discussed Betsy's ability to repay the loan. Parker advised Mr. Hunt of the net long futures positions held by her, which were reflected in Mercer's records. Mr. Hunt believed that gold and silver prices would recover from the shock of the trading-for-liquidation-only rules, and that as long as Betsy held long positions, she could repay the loan. He told Parker that he was willing to make the loan, and instructed Parker to notify him of any change in Betsy's futures positions or financial condition. Parker *477 told Mercer of Mr. Hunt's decision to make the loan, and thereafter the loan was processed routinely through HEC. Mercer gave Sheerin the information to enter on a standard HEC request for check form. The request indicated that the check was to be drawn on the account of BunkerHunt and made payable to Betsy, and further indicated that the check proceeds were for a loan. Sheerin signed the "requested by" line and indicated that her instructions came from Mercer. The completed request was returned to the HEC treasury department, which issued the check along with a voucher indicating the maker, payee, check amount, date, and the purpose of the check -- i.e., a "loan." Mercer signed the check beneath BunkerHunt's name. The check proceeds were deposited the same day into Betsy's bank account and subsequently were wired to her brokerage account to meet the margin call. Meanwhile, Sheerin prepared a demand promissory note in the principal amount of the check. The note was made payable to BunkerHunt and bore interest at the floating prime rate of the First National Bank in Dallas. Either Mercer or Sheerin called Betsy to confirm the loan transaction and to make arrangements for *478 her to sign the note. Betsy signed the note at her house in Dallas, and gave it to a waiting messenger to return to the HEC offices. After the check was drawn, HEC sent the check request to BunkerHunt, who signed on the "approved by" line to evidence his earlier oral approval and, as was his typical practice, returned the request to Mercer within the next several days. The fully completed and signed check request and check voucher were then sent to HEC's accounting department, and all the information on them was entered into both the lender's and borrower's accounting records. Over the course of the two months following the January 24, 1980, loan to Betsy, Mr. Hunt also made loans to Mary, Albert and Houston, as well as additional loans to Betsy, to enable them to meet margin calls and thereby preserve their futures positions or, in one instance, to take delivery of bullion. The procedures for some of the loans made subsequent to January 24, 1980, varied in some particulars. For instance, on some occasions Mr. Hunt talked directly to Mercer rather than relaying his instructions through Parker. On others, when Mr. Hunt was out of town, Parker consulted him by telephone. When *479 both Mr. Hunt and Parker were out of town, Mr. Hunt's agreement to make the loans was conveyed to Mercer by telephone. In one or a few instances, Mercer may have used his own judgment in advancing the funds, but only if Parker and Mr. Hunt were unreachable. It frequently took several days for HEC to receive the notes back from Houston and Mary because Houston lived in Tulsa, Oklahoma, and Mary lived in Houston, Texas. Notwithstanding the variations, the procedures and accounting for each of the loans were otherwise essentially identical to those in the first loan to Betsy. In all instances, the transactions were contemporaneously recorded and reflected as loans on the books and records both of the children and of Mr. Hunt. During 1980, the following transfers were made to the Hunt children: Transfers From Bunker Hunt in 1980
Betsy
Mary   Albert  Houston
1/24/80  $ 4,500,000
1/25/80  9,300,000
1/28/80  10,700,000
1/29/80  2,200,000
$ 19,355,000
1/30/80  3,865,000
2/1/80  12,600,000
2/5/80  1,200,000
10,070,000
2/20/80  2,600,000
2/25/80  3,900,000
2/27/80  1,400,000
3/7/80  2,350,000
3/10/80  3,800,000
3/11/80  8,050,000
3/12/80  800,000
3/14/80  7,000,000
4,000,000
3/17/80  4,100,000
3,100,000
3/24/80  1,600,000
3/25/80  1,500,000
3/27/80  150,000
550,000
7,000,000
*480 While Ellen, Betsy, Tom, Mary and Houston did not actually discuss the loans with Mr. Hunt in 1980, Albert did. Soon after Albert acquired his initial silver positions in July of 1979, silver prices dropped, and he found himself faced with a $ 50,000 margin call. Wishing to maintain his silver positions, but lacking money to meet this call, Albert called Mr. Hunt in Dallas to request a loan. Mr. Hunt agreed to make the loan and arranged for the funds to be wired into Albert's bank account in Houston, Texas. Albert repaid the loan, principal and interest, within several weeks. On January 25, 1980, Albert was again faced with a margin call that exceeded his cash resources. As a result, he travelled to Dallas to meet with his father-in-law. At their meeting, Albert told Mr. Hunt about his pending margin call, and requested Mr. Hunt to loan him the funds to meet the call, thereby enabling him to stay in the market. Mr. Hunt asked Albert about his holdings. While Mr. Hunt took notes, Albert described in detail his and Mary's long positions in silver and gold, their silver bullion which they had acquired one month earlier, his stock in a mining company, and his other assets. *481 Mr. Hunt agreed to make the loan, and arranged to have $ 19,355,000 wired to a bank account of Albert's brokerage firm. Albert executed a 90-day promissory note bearing interest at the prime rate. In 1980, Mr. Hunt loaned the following sums to Albert at prime rate: Date
Amount
Term
1/29/80  $ 19,355,000
90 days
1/30/80  3,865,000
90 days
2/5/80  10,070,000
90 days
3/17/80  7,000,000
91 days
During the period that the loans were made, Parker was instructed to advise BunkerHunt of any changes in the futures positions held by the children and about any changes in the numbers of those positions. BunkerHunt transferred over $ 125 million to his children between January 24, 1980, and March 27, 1980. Prior to the "settlement" on December 31, 1980, Mary repaid $ 1 million of principal and Betsy repaid $ 10 million in principal and $ 350,300.67 in interest. BunkerHunt's Silver Holdings
At the beginning of March, 1980, Mr. Hunt owned more than 2,700 net long silver positions (13.5 million ounces) on American exchanges, over 500 forward contracts on the London Metals Exchange and approximately 50 million ounces of silver bullion *482 and coin. A significant portion of the bullion was pledged to secure Mr. Hunt's obligations to a number of lenders who had made loans for his purchase of some of the bullion; among the largest of those obligations was a loan from Bache. All of the lending arrangements required that the value of the silver bullion pledged as collateral be between one and one-half to two times the loan amount. If collateral value dropped below the required ratio and no additional collateral were posted, the lender had the right to demand payment and liquidate the collateral to satisfy the obligation. Although Mr. Hunt at one time in late 1979 or early 1980 had approximately $ 1.8 billion cash in his bank accounts, he too eventually was unable to make margin calls on his own behalf. Sometime between March 12 and March 15, 1980, while at a health resort in California, HEC notified Mr. Hunt that he was running short of money. Mr. Hunt returned to Dallas to deal with the problem. BunkerHunt and his brother Herbert Hunt each owned 2-1/2 percent of the stock of Bache, their primary broker. They pledged this stock, as well as some of their silver bullion for margin. However, the Federal Reserve *483 initiated a rule during this period that banks could not lend cash on silver as collateral. Therefore, Mr. Hunt was unable to borrow money on his bullion in order to pay his margin calls. He travelled to Europe to borrow money where there was no such rule, but learned that the Swiss and German banks were honoring the Federal Reserve's rule. While in Frankfurt, Germany on March 17, 1980, Mr. Hunt and Parker were advised by Herbert Hunt that each of the brothers' cash was running out, and that neither BunkerHunt, Herbert Hunt, nor their brother Lamar Hunt, who also had some long silver positions, could long continue to meet their margin calls. The Hunt brothers decided to meet in New York to consider what steps to take. Meeting in Herbert Hunt's hotel room on March 18, 1980, each of the brothers listed his commodity holdings to determine the aggregate size of the futures positions held by Hunt family members and Hunt-related entities. They also listed the positions held by Hunt Minerals International, Pentad Resources, and BunkerHunt's children. BunkerHunt sought a way to hold on to his long positions. He and his brothers concluded, and Parker concurred, that if they could *484 hold on a little longer, silver prices, which had closed the day at $ 17.40 in New York and $ 17.30 in Chicago, would stabilize at approximately $ 20 per ounce, at which level the Hunt brothers would be able to retain their holdings. They calculated that they had adequate cash to meet margin calls for all brokerage accounts except those at Bache. They therefore decided to meet with Bache officials to propose that, in lieu of cash, BunkerHunt would deposit some of the unencumbered silver bullion with Bache, as security for Hunt-related obligations. At BunkerHunt's direction, Parker called Mercer and instructed Mercer to use any available funds to meet margin calls from all brokers but Bache on all Hunt-related accounts, including those of the children. Mercer carried out these instructions. BunkerHunt, Parker, and others from the Hunt family met with officers from Bache on March 19, 1980, and proposed that, for the interim, Bache take silver bullion instead of cash in satisfaction of margin obligations. Bache indicated that it would accept the silver bullion, but also indicated that it was itself in serious trouble because the Hunts' failure to meet recent margin calls had *485 caused Bache's net capital to fall so low that Bache would soon be required to report the problem to regulatory authorities. BunkerHunt arranged for the silver bullion, which was located in warehouses in London, England, to be transferred to Bache, and placed no restrictions as to which Hunt accounts the bullion could be applied. He also arranged to have one of his attorneys meet with Bache personnel tolearn about Bache's net capital problem. Transfers After March 27, 1980
On the evening of Wednesday, March 26, 1980, Herbert Hunt, who was in New York, called together all of the brokers who handled Hunt-related accounts and advised them that the Hunts could no longer meet margin calls. When futures trading opened on Thursday, March 27, 1980, a massive liquidation of Hunt positions began. During the day, the heavy selling pressure pushed silver prices downward. Spot silver dropped at one point to as low as $ 10.80 per ounce. The sell-off was indiscriminate; Bache liquidated the account of Ellen Flowers, BunkerHunt's daughter, even though she had never failed to meet a margin call. Trading was so chaotic that Bache was unable to give Mr. Hunt or the children any information *486 about the status of their accounts for several days, and was unable for several weeks to sort out accurately all of the transactions involving Mr. Hunt and the children. BunkerHunt, returning to Dallas from Saudi Arabia, prepared himself to deal with yet more difficulties. Several months earlier, he and Herbert Hunt had entered into a transaction whereby they had agreed to purchase silver bullion from Englehard Minerals & Chemicals Co. (Englehard), a large silver refiner. A payment to Englehard of $ 300 million was due in several days. Englehard officials, having been advised that no monies were available, were on their way to Dallas to meet with the Hunts on Sunday, March 30, 1980. Meanwhile, Bache officials had called the Hunts that weekend to report that, following liquidation of BunkerHunt's various futures positions, his account had a deficit of $ 17 million. BunkerHunt faced massive claims from Englehard and Bache, and was threatened with imminent default on his silver loans. Additionally, Englehard threatened to put him and Herbert Hunt into bankruptcy. He and Herbert Hunt had their attorneys prepare bankruptcy petitions in case it became advisable to voluntarily *487 file for bankruptcy. BunkerHunt and Herbert Hunt began negotiations with Englehard, offering to convey oil and gas properties to Englehard in lieu of cash. Englehard initially rejected the offer, and insisted the Hunts pay Englehard by obtaining a loan from major commercial banks, including those who had made the silver loans and those who had loaned Bache money on the strength of the Hunt silver collateral. Coincidentally, top officers of the major United States national banks were then convening in Boca Raton, Florida, and at Englehard's urging Bunker Hunt, Parker, and others from the Hunt group flew to Boca Raton Sunday evening, March 30, 1980. That night the Hunts made a presentation to the bankers, outlining their financial position and requesting a loan. The banks caucused alone. The bankers announced to Englehard and the Hunts that they were unwilling at that time to make any loan. The Hunts and Englehard then continued their negotiations through Sunday night and into early Monday morning. By approximately 5 a.m., agreement was reached whereby Englehard would take silver and oil and gas interests in satisfaction of BunkerHunt's and Herbert Hunt's obligations. *488 It became evident that BunkerHunt would need significant financing -- in the hundreds of millions of dollars -- in order to satisfy existing claims and restructure the indebtedness resulting from the silver loans. No single lender could make such a rescue loan; rather, a consortium of major lenders would be required. Upon returning to Dallas, Parker began discussing such a loan with BunkerHunt's longtime bank, First National Bank in Dallas. On Monday, March 31, 1980, Bunker Hunt was able to satisfy his $ 17 million account deficit at Bache with the proceeds from the sale of an oil and gas asset. Within a day or two, however, Bache officers telephoned the Hunt offices to advise that, after liquidation of Albert Huddleston's London accounts, there remained a deficit of approximately $ 22 million that Albert was unable to pay. Bache represented that its financial difficulties continued to be severe, and that unless the Huddleston deficit was soon paid, Bache would be in violation of net capital requirements and therefore required to disclose its problems to the exchanges and the regulatory authorities. Additionally, Bache advised Parker that Bache had obtained the money to lend *489 to the Hunts by borrowing it from a number of large United States banks, including several who had made the silver loans to BunkerHunt and had secured its obligation to those banks by pledging BunkerHunt's silver. Bache's loans from the banks had excess collateral requirements similar to those of BunkerHunt's silver loans. Bache reported that the banks from which it had obtained the money to lend to BunkerHunt were now anxiously pressing Bache for repayment. On April 7, 1980, First National Bank in Dallas, acting as part of a consortium of banks, loaned $ 300 million on an interim basis to Placid Oil Company, which was owned by various trusts created in 1935 by H. L. Hunt, BunkerHunt's father. Placid Oil Company, in turn, made a loan to BunkerHunt. There was a great deal of confusion following the sellout on March 27th, and it was several days or weeks before things were sorted out. Except for Ellen, who should not have been closed out, each of the children had large deficits in their accounts. Albert Huddleston had over a $ 22,000,000 deficit in one account. The Curnes' account deficits and that of Houston were much smaller, however. BunkerHunt was not aware of these *490 deficits for several weeks. Parker, whose instructions from BunkerHunt were to do his best in salvaging Bunker's investments, disbursed $ 22,670,139 of the $ 300 million loan proceeds to Bache in satisfaction of Albert Huddleston's deficit. He did this without notifying either BunkerHunt or Albert Huddleston in advance. BunkerHunt was initially upset to learn that his money had been used to satisfy Albert Huddleston's account deficit. BunkerHunt eventually ratified Parker's decision, and -- at trial -- acknowledged that in paying the Huddleston deficit, Parker was acting within the scope of authority granted him by Mr. Hunt. When the brokerage firms began reconciling accounts after the Silver Thursday liquidations, other deficits appeared in various of the Cargill and Bache accounts of Ellen, Betsy, Tom, Albert, Mary, and Houston. In the chaotic scramble that followed the liquidations, Cargill and Bache had used excess funds in some of BunkerHunt's accounts to satisfy those deficits in the childrens' accounts. In one instance, Cargill notified BunkerHunt that he had a post-liquidation account balance of several million dollars but told him that it would not release those *491 monies until Houston's Cargill account deficit of $ 5.4 million was satisfied. In other instances, Cargill and Bache simply transferred excess funds from BunkerHunt's accounts to cover deficits elsewhere without notifying either BunkerHunt or the appropriate person whose deficit was being covered until days or weeks later. After Ellen Flowers learned of the transfers to her accounts, she repaid BunkerHunt with interest. BunkerHunt either approved of or subsequently ratified the transfers. Unlike prior transactions, notes were never sent to the children and they in fact were not notified of the amounts paid on their behalf for several months. Thereafter, however, the children acknowledged the debts as their legal obligations. The following disbursements were made to cover deficits in the Hunt children's brokerage accounts: Recipient
Date of Transfer
Amount of Transfer
Terms
Houston
Apr. 1, 1980
$ 5,400,000.00 Houston, Prime Rate,
Demand Note
May 5, 1980
3,514,648.45 Bache, Transfer
Ellen
Apr. 3, 1980
289,180.81 Cargill, Transfer
May 7, 1980
483,065.16 Bache, Transfer
Betsy
May 7, 1980
407,003.00 Bache, Transfer
Tom
Apr. 3, 1980
1,898,770.00 Cargill, Transfer
Albert & Mary
May 7, 1980
5,838,488.00 Bache, Transfer
Albert
Apr. 9, 1980
22,670,139.00 Bache, Transfer
*492 Negotiations with the banks continued. In May of 1980, the $ 300 million interim loan made to Placid Oil Company in April was superseded by a $ 1.1-billion loan with a consortium of major commercial banks. Placid contributed the balance of the loan proceeds to a partnership composed of Placid, BunkerHunt, Herbert Hunt, and Lamar Hunt, which used the money to pay the silver-related obligations of the three Hunt brothers, including the silver loans. Settlement of the "Loans"
After Silver Thursday, Betsy and Tom Curnes, Albert and Mary Huddleston, and Houston Hunt were each insolvent. The major portion of their respective liabilities was their indebtedness to BunkerHunt for the margin loans. Once account was made of the payment of Albert Huddleston's deficit at Bache and of the transfers made by Cargill and Bache from BunkerHunt's accounts to cover the children's account deficits, the total amount of transfers made to or on behalf of the children, excluding interest was as follows: Albert and Mary Huddleston -- $ 80,948,627.66, Tom and Betsy Curnes -- $ 54,355,773.75, and Houston Hunt -- $ 19,114,648.45. Although he did not cease to charge the children interest on the *493 notes, BunkerHunt ceased accruing interest on these notes for Federal income tax purposes as of March 27, 1980. He and Caroline Hunt reported as income on their 1980 joint return all interest accrued through that date on loans to the children. Mary, Betsy and Houston were beneficiaries of the Lyda-Hunt-Bunker Trust. The Trust provided: All sums payable to any Beneficiary under the Trusts herein established shall be free and clear of the debts, contracts, alienations and anticipations of the Beneficiaries, and free and clear of all liability for levies and attachments and proceedings of whatsoever kind at law or in equity. Distributions from the trust were not guaranteed, but instead were made when the trustees deemed it necessary for the children to maintain the lifestyle to which they had grown accustomed. All three of the trustees were relatives or long-time HEC employees. Although Bunker Hunt did not serve as a trustee to the trust, his brother Herbert did until June 1980. Moreover, contrary to the wishes of the settlor and unbeknownst to one of the trustees, the trust invested in silver commodities through its interest in IMIC. It is unclear whether this was done *494 independently by one or more trustee (e.g., Herbert Hunt), or through the influence of Bunker Hunt. It is nonetheless evident that even though there were three members on the board of trustees, all were not involved in the administration of the trust. In May 1980 the Lyda Hunt-Bunker trust distributed $ 225,000 to each child. None of the children used the money to pay their father. Betsy and Tom Curnes bought a house with their distribution, after getting Caroline's Hunt's permission. (They had only recently moved back to Dallas, and were living in a rented duplex at the time.) We do not know how the other children used their distributions. Bunker Hunt occasionally discussed repayment possibilities with Houston, and periodically exhorted Parker to apply himself in devising investments for the children that would enable them to satisfy their debts. No satisfactory plan was ever devised. In October 1980 a tax attorney named Sam Miller was hired by Hunt Energy Corporation to give tax advice to Hunt family members and other entities. One of his first assignments from Jim Parker, to whom he reported, was to look into the treatment of the commodity losses and the transfers of *495 funds, to ascertain whether there was a gift tax problem, and to study the treatment of interest. Specifically, he was to determine whether the accrued but unpaid interest had to be reported by BunkerHunt (who was on the accrual method of accounting), whether accrual would continue after insolvency of the debtor, and whether the children could deduct interest paid even though the debt was settled at year's end. Miller was told that, at the time the loans were made, notes had been executed and interest was accruing on them. He was also told the children had experienced losses in their commodities trading and were presently unable to repay. Parker asked Miller to investigate whether the situation presented any gift tax problems, and told Miller that BunkerHunt still sought repayment. Later, Miller was furnished with copies of the notes and with a schedule listing the loans and partial repayments. Upon reviewing it, he determined that Ellen Flowers had repaid her debt. Except for reviewing the notes, Miller did not independently investigate the circumstances giving rise to the loans. Miller was also asked to research an item dealing with short-term capital losses. Miller testified *496 that this item referred to the children's treatment of their losses from silver trading on their 1980 Federal income tax returns. He also stated that he was not asked about nor did the short-term capital loss item refer to any possible bad debt deduction for BunkerHunt. Moreover, Miller claims to have not known that the short-term capital losses could be used by Mr. Hunt during the 1980 taxable year. In fact, in light of the huge losses of which he was told, Miller doubted that BunkerHunt would derive any current benefit from the short-term capital loss in 1980. Miller took some notes based on information given him by Jim Parker, did some legal research, and came up with a plan and an alternate plan for dealing with these events at year's end. Miller's explanation is, essentially, that he did not know the real facts but, based upon what Mr. Parker told him, made a "worst case scenario." His research indicates that the amounts transferred could have been regarded as gifts if, when the transfers were made, there was no realistic expectation of repayment. It further indicates that the children could have forgiveness of indebtedness income. Miller presented his memorandum and *497 his two plans to Parker on December 5, 1980, and urged Parker to recommend to BunkerHunt that the document labeled "plan" be adopted. The plan requirements were: (1) BunkerHunt would make demand on the children, (2) the children would be unable to pay the debt, (3) the parties would negotiate a settlement where each debtor pays Mr. Hunt an amount equal to one and one-half times their net worth before yearend, (4) the notes would be satisfied in full without bankruptcy, (5) the children would arrange to borrow money with a guarantee of someone other than the creditor, and (6) the children actually would pay one and one-half times their net worth by yearend. The anticipated tax results were that the children did not deduct interest, they kept their capital loss carryovers, and they did not realize income from the relief of indebtedness. Additionally, BunkerHunt would not report interest income, would deduct the amount of the unpaid debts as nonbusiness bad debts, and no gift would have been made. Parker instructed Miller to prepare a list of outside counsel who might provide advice on the matter, and arranged for him and Miller to meet with BunkerHunt on December 11, 1980. *498 At the meeting Miller, who had never before been formally introduced to Mr. Hunt, summarized his legal research and presented his plan. Mr. Hunt expressed surprise that anyone would possibly allege that he had made a gift, and he expressed strong reluctance about forgiving any indebtedness. Rather, he repeated his suggestion that Parker and Miller should more properly busy themselves with devising investments for the children that could ultimately serve as means of repayment. Mr. Hunt did, however, consent to have outside counsel review the matter. Parker removed Miller from outside counsel's initial deliberations. Later in the month, notwithstanding his strong reluctance to discharge most of the debt, Mr. Hunt finally assented to the recommendation of his outside counsel that, before 1980 ended, he make demand on the loans and accept from the children, in full satisfaction of their respective indebtedness, all assets that they could reasonably muster, except those assets which are exempt from claims of creditors under bankruptcy law (i.e., their homes), in settlement of the debts. Of the children, only Houston was included in these discussions. Houston telephoned Betsy and *499 Tom, who were in Illinois visiting Tom's parents for the holidays and told them they might have to come home suddenly after Christmas and they should be ready to do so. The Huddlestons were in Dallas for the holidays. Right after Christmas, Houston again called the Curneses and told them to come home. On December 28 or 29 Sam Miller met individually with Houston, Tom Curnes, and Albert Huddleston, and made demand for the entire amount due from them and their spouses. Albert and Tom were apparently stunned. When they said they could not pay, they were told they would have to turn over all their assets by December 31 and become insolvent. Each agreed to cooperate, lists of assets were prepared, values assigned to those assets, and documents evidencing the agreement and effecting the conveyances were prepared. The tax ramifications for themselves and for Mr. Hunt were spelled out for the children at this time. Miller stressed the need for insolvency so that the children could avoid forgiveness of indebtedness income. Although Miller testified he recommended the daughters be present, they were not included. Except for Houston, BunkerHunt never spoke personally to any of the *500 children about this matter, because he found the fact that he was not going to be repaid too painful to discuss. The children made lists of their assets, and employees of HEC also provided lists for the individuals whose records they kept. All assets which could be readily transferred directly to BunkerHunt, such as jewelry, coins, or horses, were directly transferred. However, he did not wish to receive interests in partnerships or real estate, so loans were arranged for the children through First National Bank in Dallas, to provide sufficient cash to pay Mr. Hunt the equivalent of the value of the retained assets in cash, and to provide sufficient cash for the fourth quarter estimated income tax payments which all owed. [4]
The loans were guaranteed by Hassie Hunt Corporation, of which James Parker *501 was president. Houston borrowed $ 250,000; the Huddlestons borrowed $ 900,000 plus $ 500,000 from Albert Huddleston's father; and Tom and Betsy Curnes borrowed $ 94,724 from Tom's parents, as well as $ 200,000 from the First National Bank in Dallas. All of these loans were apparently subsequently paid off by the children; however, there is question about the validity of the $ 500,000 loan from Albert Huddleston which was cancelled by Albert's father in return for Albert's cancellation of a receivable from the 3-H Corporation, a corporation in which Albert and his father were shareholders. All documents required to effect the discharge of indebtedness and conveyance of assets were executed and delivered before midnight on December 31, 1980. To the extent that ministerial details remained in order fully to effect the conveyances that had been made on New Year's Eve, those details were promptly attended to in early 1981. None of those assets was ever returned to the children. The parties have stipulated the values of most of the items turned over to BunkerHunt, except for Albert's receivable. Respondent disputes whether all items were in fact turned over on December 31, 1980. *502 Petitioner acknowledges everything was not physically transferred on that date, but contends that the papers signed on that date gave legal possession to Mr. Hunt and that actions taken after that date were merely to perfect the transaction. The children all claim they were legally insolvent both before and after the settlement. On December 31, 1980, the children each executed an "AGREEMENT OF SETTLEMENT AND RELEASE." Betsy and Tom Curnes agreed to transfer to BunkerHunt, in satisfaction of their debts to him, $ 217,724 in cash and all right, title, and interest in the following list of assets: 1. Twelve diamond stones, each approximately one half to one carat in weight; 2. Two bags of $ 1,000 face amount silver half dollars; 3. Account No. 402-766-01K with Union Bank of Switzerland (all assets therein); 4. 256 Austrian Corona gold coins; 5. 260 gold Mexican pesos; 6. 25,000 shares of Yucca Butte Corporation capital stock; 7. Eurodollar Time Deposit dated December 29, 1980, in the principal amount of $ 200,000 issued by First National Bank in Dallas, maturing January 5, 1981 (including accrued interest); 8. Hunt Industries Partnership A; and 9. All of *503 their rights, title and interest in and to all of their oil and gas mineral and royalty interests located within the United States and all oil, gas and other hydrocarbon production and products and all personal property located on or used in connection with all such interests. The Huddlestons executed an identical agreement transferring to BunkerHunt the following items on December 31, 1980, in satisfaction of their debt: 1. $ 1,250,000 in cash; 2. the horse named "Double Your Fun"; 3. the weanling horse sired by "Blushing Groom" out of "Double Your Fun"; 4. the yearling colt sired by "African Sky" out of "Fascinating Trick"; 5. Seven bags of 90 percent silver coins; 6. All the ancient Roman coins owned by Mary and Albert; 7. 20,000 shares of Class "A" stock of Western Islands, Inc.; 8. 2,000 shares of Class "B" stock of Western Islands Inc.; 9. Account Nos. 582-917-07M and 402-772-03J with Union Bank of Switzerland (all assets therein); 10. 284 Austrian Corona gold coins; 11. 283 gold Mexican Pesos; 12. 25,000 shares of Yucca Butte Corporation stock; 13. $ 600,000 Eurodollar Time Deposit dated December 29, 1980, issued by the First National *504 Bank in Dallas, maturing January 5, 1981, and all interest accrued; 14. Hunt Industries Partnership A; and 15. All of Albert's and Mary's right, interest and title in and to all of their oil and gas mineral and royalty interests located within the United States and all oil gas and other hydrocarbon production and products and all personal property located on or used in connection with all of such interests. Houston executed an identical agreement, transferring to BunkerHunt the following assets in satisfaction of his debt on December 31, 1980: 1. $ 65,000 in cash; 2. Account Nos. 402-772-02K and 582-917-05B with the Union Bank of Switzerland (all assets therein); 3. 227 Austrian Corona gold coins; 4. 25,000 shares of Yucca Butte corporation stock; 5. 143 gold Mexican Pesos; 6. Any and all accounts receivable from Hunt Energy corporation; 7. A $ 400,000 interest in a $ 550,000 Eurodollar Time Deposit dated December 29, 1980, issued by the First National Bank in Dallas; and 8. All of Houston's right, title and interest in and to all of his oil and gas mineral and royalty interests located within the United States and all oil, gas and other hydrocarbon *505 production and products and all personal property located on or used in connection with all of such interest. OPINION As a preliminary matter, petitioners bear the burden of proof on all matters in issue, except those raised by respondent in the amendment to his Answer. Rule 142(a). Furthermore, since these cases involve transactions between and among family members the transactions themselves are subject to greater scrutiny. Estate of Van Anda v. Commissioner, 12 T.C. 1158 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951). 1. Gift or Bona Fide Loan
The first question to answer is whether any of the transfers from Mr. Hunt to the children between January 24, 1980, and March 27, 1980, were gifts, or, for the period March 17-27, 1980, deductible expenses under section 212. The term "gift" is not defined in the Internal Revenue Code. Moreover, determining whether transfers qualify as gifts within the meaning of the gift tax laws differs from that determination under the income tax laws. Section 102 excludes any amount received as a gift from *506 the recipient's income. In those instances, the donative intent of the transferor is paramount. Commissioner v. Duberstein, 363 U.S. 278 (1960). For purposes of the gift tax, section 2501(a)(1) imposes a tax on all transfers of property by gift. Congress intended to use the term "gift" in its broadest and most comprehensive sense in the gift tax area. H. Rept. No. 708, 72d Cong., 1st Sess. (1932), 1939-1 C.B. (Part 2) 457, 476; S. Rept. No. 665, 72d Cong., 1st Sess. (1932), 1939-1 C.B. (Part 2) 496, 524. Moreover, all transactions whereby property or property rights or interests are gratuitously passed or conferred upon another, regardless of the means or device employed, constitute gifts subject to tax. Sec. 25.2511-1(c), Gift Tax Regs. A transfer is a gift where "property is transferred for less than an adequate and full consideration in money or money's worth." Sec. 2512; sec. 25.2511-1(g), Gift Tax Regs.; Commissioner v. Wemyss, 324 U.S. 303 (1945). *507 The donative intent of the transferor, or the lack thereof, is irrelevant in determining whether or not the transfers are subject to the gift tax. Commissioner v. Wemyss, supra at 306. In these cases respondent's primary contention is that the transfers from Mr. Hunt to the children constituted gifts subject to the gift tax. Respondent contends that the total amounts transferred were gifts and that the notes executed by the recipients were of no import. Based on these conclusions respondent disallowed all bad debt deductions which were premised on the children's failure to repay the transferred amounts and determined Mr. Hunt and Mrs. Hunt were liable for gift taxes. Conversely, petitioners argue that not only did Mr. Hunt lack donative intent, but that all the transfers made through March 27, 1980, [5] constituted bona fide loans and that the notes represented full and adequate consideration for the money transferred. They also contend that sums transferred after March 17, 1980, were expenses incurred for the management, conservation or maintenance of property held for the production of income and were deductible pursuant to section 212. Thus, for the period *508 between March 17, 1980, through March 27, 1980, petitioners argue two alternative theories: (1) that the sums transferred were bona fide loans, and (2) the sums transferred were deductible expenses. Therefore, March 17, 1980, and March 27, 1980, are two important dates which may indicate the appropriate place to draw the line between loans, gifts and section 212 expenses. The bona fides of a loan for estate and gift tax purposes are primarily established by the intention of the parties to repay the loan according to the terms of the agreement. Ribblesdale v. Commissioner, T.C. Memo. 1964-177. The determination of whether a debt is bona fide for purposes of the gift tax provisions is essentially the same as the determination of whether a debt is bona fide for purposes of the bad debt deduction. In the context of bad debts we determine whether the debt arises from a debtor/creditor *509 relationship based upon a valid and enforceable obligation to repay a fixed or determinable sum of money. Sec. 1.166-1(c), Income Tax Regs.
In order to prove bona fide indebtedness, the taxpayer must show that the loan is not contingent and that the loan was made with a reasonable expectation, belief and intention that the advance would be repaid. Zimmerman v. United States, 318 F.2d 611 (9th Cir. 1963). Respondent contends that repayment of the advances to the children was contingent upon the Hunt children's success in the silver market. Therefore, respondent argues that these advances constitute contingent loans. We disagree. Respondent confuses contingencies with risks. A contingency creates a condition precedent to the obligation to repay an advance. See Zimmerman v. Commissioner, supra; Clark v. Commissioner, 18 T.C. 780 (1952), affd. 205 F.2d 353 (2d Cir. 1953). To the extent we determine the advances *510 in these cases were loans, we do not find that the obligation to repay those advances was contingent upon a rise in the price of silver. Instead, we find that the obligation to repay the advances was fixed; however, there was a sizable risk that the advances could not be repaid unless there was a rise in the price of silver in the commodities market. The taxpayer must next show that the advances were made with a reasonable expectation, belief and intention that they would be repaid. This determination depends upon all of the facts and circumstances and generally no one fact is determinative. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). In making this determination we consider all of the following facts: (1) whether a note or other evidence of indebtedness exists, Clark v. Commissioner, 18 T.C. 780, 783 (1952), affd. 205 F.2d 353 (2d Cir. 1953); (2) whether interest is charged, Clark v. Commissioner , supra; (3) whether there is a fixed schedule for repayment, Clark v. Commissioner, supra; *511 (4) whether any security or collateral is requested, Zimmerman v. United States, supra at 613; (5) whether there is any written loan agreement, Road Materials, Inc. v. Commissioner, 407 F.2d 1121 (4th Cir. 1969), affg. a Memorandum Opinion of this Court; (6) whether a demand for repayment has been made, Montgomery v. United States, 87 Ct. Cl. 218, 23 F. Supp. 130 (1938), cert. denied 307 U.S. 632 (1939); (7) whether the parties' records, if any, reflect the transaction as a loan; Road Materials, Inc. v. Commissioner, supra; (8) whether any repayments have been made, Estate of Ames v. commissioner, a Memorandum Opinion of this Court dated Feb. 7, 1946, 5 T.C.M. 73, 15 P-H Memo T.C. par. 46,036; and (9) whether the borrower was solvent at the time of the loan, Jewell Ridge Coal Corp. v. Commissioner, 318 F.2d 695 (4th Cir. 1963). See also Goldstein v. Commissioner, T.C. Memo. 1980-273. Based on the facts of these cases, we find that at least a portion of the transfers from BunkerHunt to the children created a debtor/creditor relationship *512 and bona fide indebtedness. In Zimmerman v. United States, 318 F.2d 611 (9th Cir. 1963), the taxpayers had advanced funds to a newly formed medical society. The funds were advanced until such time that the organization was financially stable and could repay a portion of the advance to the taxpayer without jeopardizing its existence. The District Court found "that the members and directors of the society 'were filled with good intentions to repay Dr. Zimmerman,' but nevertheless concluded that the advances were not 'debts' within the meaning of the term as used in section 166 of the Code." 318 F.2d at 612. The Ninth Circuit Court of Appeals affirmed on the grounds that the District Court had correctly determined that the loan was contingent, i.e., "there was no absolute obligation to repay." Given that there was no evidence that the contingencies (financial stability and ability to repay without jeopardy to the organization) ever occurred, the Court of Appeals noted that no bona fide debt existed. In Zimmerman there was also an absence of several of the normal indicia of a debtor/creditor relationship. There was no reasonably fixed maturity *513 date, no note, no provision for interest or security and no evidence that Dr. Zimmerman ever made demand for repayment. The facts of the cases before us are clearly distinguishable, both in substance and form, from the facts of Zimmerman. First, these loans were not contingent. Second, many of the indicia of a debtor/creditor relationship exists in these cases. There is no question that notes evidencing the indebtedness exists here. It is also clear that interest accrued on these notes, at least up through March 27, 1980. A demand for repayment was made on December 31, 1980, although Bunker Hunt then knew that the amounts could not be repaid. Also both Mr. Hunt and the children treated the transactions as loans on their books and records maintained at HEC. Partial repayments were made by Mary and Betsy. Ellen repaid all the sums she borrowed. Also important is the history of intra-family loans that had previously been repaid by all petitioners. On the other hand, no security or collateral was requested by Mr. Hunt before making any of the advances in this case. He also failed to make and maintain a complete inventory of the children's assets during the time the advances *514 were made (although through HEC he was aware of many of the children's assets). Also, although there were notes and requests for checks in these cases, there was no loan agreement nor was there a fixed repayment schedule. Instead, all the notes from Mary, Betsy and Houston were demand notes bearing interest at the prime rate at First National Bank in Dallas. (The notes from Albert Huddleston did have a fixed maturity date and were due either 90 or 91 days after the transfer.) Finally, it is not clear whether all the children were solvent at the time all the loans were made. Respondent asks us to consider additional factors in determining whether the transfers between Mr. Hunt and the children created bona fide indebtedness. Respondent suggests these additional objective factors are necessary, because of the family relationship, to our determination of whether the transfers created bona fide indebtedness: (1) the source of payments of principal or interest; (2) the status of advances in relation to other creditors; (3) ability to obtain loans from outside lenders; (4) failure of the debtor to pay on the due date; and (5) the risk involved in making advances. These factors are *515 generally applied to transfers between shareholders and their controlled corporations to determine the economic substance of the transfers. Respondent does not direct us to any intra-family loan cases where any of these factors are explicitly applied. As a general rule we are not persuaded by respondent's arguments that the factors relevant to a determination of whether an advance to a corporation is debt or equity are relevant to our determination here. These cases involve intra-family loans, not advances to a corporation by its shareholders. As petitioners point out, in the debt-equity determination it is beneficial (for tax purposes) for both the shareholder and the corporation to establish debt at the time the funds are transferred. Thus, both the corporation and the shareholder have an intent to create debt. In those situations, the Court looks much more closely at objective factors in reaching its decision. In the context of intra-family loans, however, our focus is much more on the intent of the parties. Unlike the debt-equity cases where the corporation and the shareholders share the same interest in creating debt for tax purposes, in these instances, even though *516 the parties are related, the "lender" and the "borrower" have conflicting interests. In these cases, the children benefit but the parents suffer if the transfers are characterized as gifts. Conversely, if the transfers are characterized as loans, the parents are advantaged but the children risk having substantial income from the relief of indebtedness. Here the children argue that they were insolvent when the debts were forgiven, and are therefore not liable for any income tax consequences. However, the fact that the children do not argue that the transfers were gifts does not mean, as is implied by respondent, they are lying about the transfers being loans. It also does not mean the children are conspiring to create the best tax results for their father with the hope that they too will avoid any adverse consequences, and are therefore distorting their true intent at the time of the transfer. Sometimes family members transfer funds to one another and call it a loan because it really is a loan; [6] the lender truly expects repayment and the borrower truly intends to repay the debt. *517 Respondent argues that we should disregard the steps petitioners took to conform the transfers to loans. Relying on Alterman Foods, Inc. v. United States, 505 F.2d 873 (5th Cir. 1974), respondent states that we should consider petitioners' consistent financial reporting "to be little more than additional declarations of intent, without any accompanying economic indicia of debt." 505 F.2d at 877. Respondent further makes much of the fact that the transfers, bookkeeping and accounting entries and note preparation were performed by HEC personnel with "little or no instruction from, involvement of, or knowledge by the parties at the time the events were taking place." We disagree with respondent's factual assumptions and his legal implications. First, we find that the personnel of HEC were acting on the basis of standing orders of both BunkerHunt and the Hunt children. The main function of HEC was to provide financial services for petitioners in these cases. We see nothing inherently wrong with the fact that HEC high level employees initiated the loan transactions, or that the parties were not consulted before each transfer was made. Moreover, *518 respondent's assertion that these debts cannot be bona fide because the children were not asked whether they would prefer to liquidate their positions rather than accept additional funds from their father, ignores the facts of these cases. The children had standing orders with their brokerage houses to contact HEC directly for margin call payments. All of the children are very bright and were aware they were signing notes to cover their margin calls. Had any of the children desired to liquidate their positions rather than continuing to increase their indebtedness, they could have and would have contacted their brokers. Ellen Flowers did liquidate a large portion of her holdings when silver reached $ 20 per ounce. The other Hunt children did not. We do not believe, as respondent asserts, that the above facts created a paper trail after the fact. Instead we find that all of the steps taken were contemporaneous memorializations of the parties' intent. Furthermore, respondent's reliance on Alterman Foods is misplaced. In Alterman Foods the court was faced with transfers of funds between wholly owned subsidiaries and a parent corporation. The taxpayer corporations claimed *519 that the advanced sums were loans from the subsidiaries to the parent. The government argued that the sums paid to the parent constituted dividends. The trial court set aside the jury's decision and held that the facts of the case clearly indicated that the amounts did not constitute bona fide debts and constituted dividends. In affirming the decision, the Court of Appeals noted that the same individuals were executive officers of the parent corporation and the wholly owned subsidiaries and that it was "highly unrealistic to expect them to enforce obligations against themselves." Alterman Foods, Inc. v. United States, supra at 877. The court found a lack of ambiguity as to the intent of the parties such that their assertion of their intent was meaningless. The court was also persuaded by the fact that there was no discernible business purpose for the transfers, there was no repayment schedule, no fixed maturity date, no indication the sums would be repaid some time in the future, no interest charged and no collateral provided. It was in this context that the court stated: What factors the taxpayer does argue are in our opinion insubstantial. Such allegedly *520 objective economic indicia of debt such as consistent bookkeeping and consistent financial reporting on balance sheets are in our opinion little more than additional declarations of intent, without any accompanying objective economic indicia of debt. * * * [505 F.2d at 879.] Obviously the facts here vary greatly. First, we do not consider the parties' declarations of their intent to be meaningless. In these cases, all of the testimony is consistent with the documentation and the economic reality, not contrary to the obvious purpose. Second, we do not find petitioners' evidence to be insubstantial. Third, the different settings of these cases make it apparent that any result reached in a case involving a corporation and its wholly owned subsidiary is not necessarily controlling in an intra-family loan case. We also disagree with respondent's implication that any time related taxpayers conform with the requirements to create bona fide debts we should disregard such steps as self-serving testimony. We recognize that the substance rather than the form of a transaction *521 governs the tax consequences. Gregory v. Helvering, 293 U.S. 465 (1935). Here respondent argues that we should disregard the form but that we should also find against petitioners because they did not comply with all the necessary steps to create a bona fide debt. We will not operate on the premise that if the taxpayers follow all the right steps we will ignore it as self-serving; and yet, if they fail to comply with all the right steps, take that failure as conclusive evidence of their lack of intent to create a bona fide debt. We look at all the facts and circumstances to determine if, in substance a bona fide debt was created. In so doing we will not ignore the objective indicia of a bona fide debt. We find that BunkerHunt had a reasonable expectation and belief he would be repaid when he made transfers to his children up to and including Friday, March 14, 1980, and that these transfers are bona fide loans. Transfers made after March 14, 1980, however, are not. Our reasons for the decision is twofold. First, on or about March 15, 1980, BunkerHunt was notified, while in California that he was running low on funds to meet margin calls. After *522 being notified Mr. Hunt returned to Dallas and then left for Europe to attempt to secure financing to meet his own margin calls. Second, on Monday, March 17, 1980, the spot price of silver fell below $ 20 per ounce. BunkerHunt was generally aware that he could not maintain his position if the price of silver remained below $ 20 per ounce. Obviously, Mr. Hunt's resources far exceeded those of his children and he should have realized that the loans to them were in jeopardy after March 15, 1980. Nevertheless, on Monday, March 17, 1980, he approved transfers to his children equal to $ 14.2 million dollars. We are mindful of the fact, according to both petitioner's and respondent's experts, that the Curneses and the Huddlestons had a negative net worth before the transfers made on March 17, 1980. While this is relevant, we do not find it to be determinative. See, e.g., Cimarron Trust Estate v. Commissioner, 59 T.C. 195 (1972). The experts went into great detail and complicated computations in determining the value of the futures contracts to determine the exact dates when each of the children reached a negative net worth. These detailed calculations were *523 necessary because the market was, on many occasions, locked in limit down prices. BunkerHunt could not have engaged in those calculations on the date of each transfer before determining whether to approve a loan, and we do not hold him to such a standard. Mr. Hunt knew or should have known, through his employees, the approximate number of positions his children held in silver and gold futures contracts during January, February and March. The market started to fall in mid-January and although the downward trend was continuous, there were times where the market prices for gold and silver did rise. But by March 17, 1980, the children were hopelessly insolvent, and if Mr. Hunt had taken any time to consider their net worth he would have realized it was negative. The transfers made between March 18 and March 27, 1980, were not bona fide loans for another reason as well. On March 18, 1980, Mr. Hunt notified HEC to cover all Hunt-related margin calls save those at Bache. On that date he decided that the children's commodity accounts would not be involuntarily closed out at a deficit. That is, as long as the children did not liquidate their positions, BunkerHunt through HEC would *524 cover the margin calls, regardless of any intent or ability to repay the funds. Obviously, if the touchstone to creating a valid debt is the intention of both parties to have the debt repaid, these transfers fail. After March 18, 1980, the children's intent to repay was not considered. Therefore, any advances made on or after March 18, 1980, did not create a valid debtor/creditor relationship. The entire amount transferred up to and including March 14, 1980 ($ 107,690,000), [7] less repayments of principal ($ 11,000,000), or $ 97,320,000, created bona fide indebtedness and may be eligible for a bad debt deduction to the extent not repaid and to the extent petitioners prove the other elements of the bad debt deduction. *525 2. The Loans -- Full and Adequate Consideration
Respondent contends that BunkerHunt nevertheless made a gift of any transfers the Court determines were bona fide loans. Respondent rests this belief on the notion that the notes did not represent "full and adequate consideration" for the amounts transferred. Petitioners counter that since the prime rate of interest was charged, the notes did constitute full and adequate consideration. Moreover, petitioners contend the loans were made in the ordinary course of business thereby being exempt from the gift tax provisions. Sec. 25.2511-1(g)(1), Gift Tax Regs. Section 2511 provides, subject to certain limitations, that a tax is imposed on the transfer of property by gift, whether in trust or otherwise, whether direct or indirect, whether the property transferred is real or personal or tangible or intangible. The transfer tax is imposed on the value of the property on the date of the transfer. Sec. 2512(a). "Where the property is transferred for less than an adequate and full consideration in money or money's worth, then the amount *526 by which the value of the property exceeded the value of the consideration shall be deemed a gift * * *." Sec. 2512(b). Section 25.2511-1(g)(1), Gift Tax Regs., provides that the gift tax does not apply to ordinary business transactions as described in section 25.2512-8, Gift Tax Regs. Section 25.2512-8, Gift Tax Regs., provides a three part test to qualify for the ordinary course of business exception. The taxpayer must prove the transaction (1) was bona fide, (2) was at arm's length, and (3) was free from donative intent. Petitioners have satisfied us that the transfers up to and including March 14, 1980, were bona fide debts. Petitioners have also convinced us that those particular transfers lacked donative intent. Petitioners have failed to establish, and would not be able to establish, the loans were made at arm's length (i.e., the children would not have gotten as favorable terms from an unrelated lender). However, this failure does not detract from the bona fides of the loans. An intra-family loan need not be at arm's-length to be bona fide. *527 Estate of Elkins v. United States, 457 F. Supp. 870 (S.D. Tex. 1978). Since petitioners do not qualify for the ordinary course of business exception, they must prove the notes represented full and adequate consideration for the loan amounts transferred. Petitioners have attempted to meet this burden through reliance on the fact that the prime rate of interest at First National Bank in Dallas was charged on the loans and on the Supreme Court's Opinion in Dickman v. Commissioner, 465 U.S. 330 (1984). In Dickman, the Supreme Court held that the interest-free demand loans from parents to their son and to a closely-held family corporation constituted taxable gifts to the extent of the interest that could have been earned. We believe the principle of Dickman is applicable here. Since BunkerHunt charged the prime rate of interest on the notes, and the notes represented bona fide loans, the notes constituted full and adequate consideration for the funds transferred. [8]
*528 Therefore, not only were the transfers made between January 24, 1980, and March 14, 1980, bona fide loans, the notes also constituted full and adequate consideration for the amount transferred. 3. Expenses for the Management, Conservation and Maintenance of Property Held for the Production of Income
Petitioners next argue that all transfers made to or on behalf of the children on or after March 17, 1980, are deductible pursuant to section 212. [9] That is, Mr. Hunt claims that it was ordinary and necessary to cover any margin calls and to repay any account deficits of his children for the management, conservation and maintenance of property he himself held for the production of income -- namely his silver contracts and his silver bullion. *529 Petitioners' argument is that Bunker Hunt correctly believed his own investment assets were in jeopardy and that the transfers were necessary to maintain those assets. As grounds for Mr. Hunt's belief, petitioners set forth five "dilemmas" which they claim necessitated the payments by Mr. Hunt before and after Silver Thursday, March 27, 1980. The "family ties dilemma", is the first petitioners relate. They claim that the trading activities of all the Hunts were widely publicized and that market participants, even if they distinguished between BunkerHunt and his family members, viewed any Hunt family "weakness" (i.e., liquidation of silver contracts) as BunkerHunt weakness. Petitioners claim if any Hunt positions were liquidated the price of silver would fall either because the market would perceive it (1) as BunkerHunt's financial inability to meet margin, or (2) as BunkerHunt's losing his "bullish" view on silver. Petitioners also claim the "Bache dilemma" required BunkerHunt to make transfers on or after March 17, 1980. Petitioners claim Bache informed them that it was having financial trouble of its own because of the Hunts' inability to meet margin calls. Bache *530 told BunkerHunt that it would soon be required to disclose its shrinking capital position to the exchanges and regulatory authorities. Mr. Hunt claims that if it became public knowledge that Bache's capital shortage was due to the Hunts' inability to meet margin, the price of silver would plunge. After all the Hunt positions were liquidated BunkerHunt still had enormous holdings of silver bullion (although most of it was encumbered). In order to preserve his silver holdings and retain what he believed to be its inherent value, Mr. Hunt claims he was also faced with the following dilemmas. The "shrinking-target dilemma": Mr. Hunt's silver bullion collateralized several loans. In order to serve as collateral, the value of the silver had to equal 150 to 200 percent of the value of the loan. If the price of silver continued to fall, the collateral would be insufficient to exceed the loan amounts by the required percentage. In that event, the collateral could be liquidated. Next comes the "golden rule dilemma": BunkerHunt could only get refinancing through the cooperation of a consortium of major banks. His failure to repay the deficits in his children's accounts would be *531 viewed unfavorably by the banking community. Finally comes the "credit dilemma": Any Hunt default would result in damage to the favorable trade credit arrangements that Hunt family members and related entities enjoyed. Respondent counters that (1) petitioners have not presented any specific evidence in support of the section 212 deduction other than their own testimony, (2) that several of the transfers made after March 27, 1980, were done without BunkerHunt's knowledge and were ratified long after the transfers were made, and (3) section 212 does not permit a deduction for the payment of another's obligation unless the motive for paying is to manage, conserve or maintain property held by the taxpayer for the production of income and the payment is an ordinary and necessary expense for the management, conservation or maintenance of such property. We agree with respondent. In the case of an individual, section 212 provides a deduction for ordinary and necessary expenses paid or incurred during the taxable year for the management, conservation or maintenance of property held for the *532 production of income. Sec. 212(2). Section 1.212-1, Income Tax Regs., further specifies in pertinent part: (d) Expenses, to be deductible under section 212, must be "ordinary and necessary". Thus, such expenses must be reasonable in amount and must bear a reasonable and proximate relation to the production or collection of taxable income or to the management, conservation, or maintenance of property held for the production of income. The reasoning under section 162 for determining the deductibility of trade or business expenses is applicable to the determination of deductions pursuant to section 212. Trust of Bingham v. commissioner, 325 U.S. 365, 373 (1945). In the context of section 162, we have allowed taxpayers a deduction for the payment of another's legal obligation. To be entitled to the deduction under section 162 the taxpayer must show: (1) that his motive for paying the obligation of the other person is to protect or promote the taxpayer's own trade or business and (2) the expenditure is an ordinary and necessary expense *533 of the taxpayer's trade or business. Lohrke v. Commissioner, 48 T.C. 679 (1967). We have denied the deduction in other cases where one family member paid the debt of another. Rollins v. Commissioner, T.C. Memo. 1979-331, affd. without published opinion 668 F.2d 530 (5th Cir. 1982). Transactions between family members are given close scrutiny. Estate of Van Anda v. Commissioner, supra.
Applying the 2-part test in the context of section 212(2) requires the taxpayer to prove: (1) that his motive for paying another's obligation is to manage, conserve or maintain property of the taxpayer held for the production of income; and (2) that the payment is an ordinary and necessary expense for the management, conservation or maintenance of such property. Rollins v. Commissioner, supra.
Thus, assuming BunkerHunt held his silver futures contracts and silver bullion for the production of income, we must determine (1) Mr. Hunt's motive for making the expenditures; and (2) whether meeting the margin *534 calls of his children between March 17, 1980, and March 27, 1980, and covering deficits in their accounts thereafter were ordinary and necessary expenditures (Lohrke v. Commissioner, supra), reasonable in amount and proximately connected to the management, conservation or maintenance of his silver assets. Sec. 1.212-1(d), Income Tax Regs.
"Ordinary" expenses are usual and customary but need not be habitual. Deputy v. du Pont, 308 U.S. 488, 495 (1940); Welch v. Helvering, 290 U.S. 111 (1933). "Ordinary" has also been interpreted to mean "normal," or "the response ordinarily expected." Commissioner v. Heininger, 320 U.S. 467, 471 (1943). "Necessary" does not mean indispensable; rather if a payment is "appropriate and helpful," the statutory requirement is met. Commissioner v. Heininger, supra at 471; Welch v. Halvering, supra at 113. On and after March 17, 1980, Mr. *535 Hunt transferred funds to meet the margin calls on the children's accounts, to cover deficits in those accounts, to enable Mary to take delivery of silver bullion, and to enable Mary and Albert to pay their estimated taxes. Placid Oil also transferred funds to BunkerHunt, who in turn transferred funds to cover a deficit in Albert's London Bache account. Mr. Hunt also transferred $ 150,000 to Betsy on March 27, 1980. We do not know the purpose of this transfer. Petitioners first claim that the family relationship required Mr. Hunt to meet the children's margin calls on and after March 17, 1980, to protect his own silver holdings. News of the children's liquidation, they contend, would have caused a tremendous plunge in the price of silver. This claim is similar to that made by the taxpayer in Rollins v. Commissioner, T.C. Memo. 1979-331, affd. without published opinion 668 F.2d 530 (5th Cir. 1982). In Rollins, the taxpayer paid the debts of his uncle's three closely-held businesses. The taxpayer claimed that the stock price of his publicly-traded company would suffer from negative publicity about his uncle. The Court held that the relationship *536 between the taxpayer and the uncle was too remote and that the taxpayer had failed to prove that anyone would confuse the business dealings of his uncle with his own business dealings. In these cases the relationship between the parties is obviously closer (parent and child). However, here, like Rollins, petitioners have failed to prove that the general public would have learned of a liquidation of the children and/or that the public would draw negative inferences about BunkerHunt from the liquidation of his children, of which only Houston had the Hunt last name. We are also not persuaded that the margin calls would have necessarily caused all the children's positions to be liquidated. Presumably, the brokerage houses would sell only as many of the positions as necessary to meet the margin call. Also, there was no evidence to suggest that a liquidation of a portion of the Hunt children's positions would have been abnormally high in comparison to normal trading so as to draw attention to the partial sell-off. Finally, petitioners did not present any evidence to suggest their agents would disclose the identity of the Hunt children during any partial sell-off in violation *537 of petitioners' expectations of confidentiality. In sum, it would be speculative for the Court to assume that the general public would attribute the liquidation of the Hunt children, five of six who had different last names, to BunkerHunt; and that the children's liquidation would cause the price of silver to fall. We are also not persuaded by the fact that Bache liquidated the account of Ellen Flowers along with all the other "Hunt" accounts on March 27, 1980. Contrary to petitioners' assertions, this does not demonstrate that the market viewed all relatives of BunkerHunt as one group. It only demonstrates that Bache viewed all his relatives as a group. Another possible explanation for Bache's action is that Bache was told that Ellen Flowers' account was a Hunt-related account on March 19, 1980, when Bache was given bullion rather than cash to meet margin on all Hunt-related accounts. Petitioners also rely on the so-called "Bache dilemma" to support their position. We remain unconvinced that any real "dilemma" existed. Petitioners' claim to that effect is hearsay, although we do not doubt Bache conveyed the message to BunkerHunt. Thus, while it may be true that Mr. *538 Hunt believed Bache was in a "precarious financial condition" in that its shrinking capital position would soon have to be disclosed to the exchanges and regulatory officials, we fail to see how this fact presented a dilemma, not easily rectified, and would result in a drop in the price of silver. First, if Bache were really in such a serious financial position, it always had the right to liquidate the Hunt children's accounts (assuming there was a margin call) in order to rectify the situation. We sincerely doubt that any other investor at Bache would be given the latitude that Mr. Hunt and his children were given. Second, even if the shrinking capital position of Bache were disclosed to the exchanges and regulatory authorities it does not mean the price of silver would fall. This belief assumes that if the financial position of Bache were disclosed to authorities that the information would become public, that the disclosures would reveal that the Hunts were the cause of the problem, or that Bache's financial difficulty standing alone would cause a drop in silver prices. While any or all of the above assumptions might have occurred, petitioners offered no evidence to prove *539 that these assumptions were anything more than mere possibilities. Finally, the financial condition of Bache was not disclosed to Mr. Hunt until March 19, 1980. The only transfers between that date and the liquidation on Silver Thursday were two transfers on behalf of Houston, a transfer to Betsy (the purpose of which is unknown), and a transfer to Albert so that the Huddlestons could take delivery of silver. Much of the funds transferred on behalf of Houston were used to cover deficits in his Cargill account. Thus, the "Bache dilemma" was not a factor in and cannot justify any transfers to Betsy or Albert, or on behalf of Houston to his Cargill account under section 212. We are also not swayed by the other "dilemmas" petitioners rely on in making transfers after Silver Thursday to cover deficits in the Hunt children's accounts. Petitioners claim that since silver bullion collateralized several loans, a drop in the price of silver would place the collateral at risk. Petitioners have failed to demonstrate, however, just how an uncured deficit in a Hunt child's account would cause the price of silver to fall. Also, petitioners never offered any evidence as to how much the *540 price of silver would have to fall before BunkerHunt's collateral would be liquidated. Obviously any of Mr. Hunt's creditors could have testified on this matter, but none were called. We assume their testimony would not have been favorable. Witchita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We make the same finding with regard to the so-called "golden rule dilemma". Petitioners claim a rescue loan from any bank or banks was contingent on BunkerHunt's "making good" on his children's deficits. Although the banks may have made it crystal clear to Mr. Hunt that unless the deficits were repaid there would be no rescue loan, petitioners have not made this "fact" crystal clear to the Court. Petitioners do not indicate which documents specify this requirement, nor did they present any banking representatives to verify this fact. Petitioners have not shown us that they were required to make any payments after March 27, 1980, at the insistence of the banking community. Finally, we remain unconvinced that the "credit dilemma" served as justification for the payments. First, if the other Hunt-related *541 entities were concerned, why did they not aid BunkerHunt in paying off these obligations? Second, and more importantly, petitioners never presented any evidence to support the claim that Hunt-related entities would be treated differently if the Hunt children's deficits remained uncured. In conclusion, as to these post-Silver Thursday dilemmas, we do not believe any of these problems were the impetus for BunkerHunt's making the transfers at the time they were made. Mr. Hunt was informed of the $ 22 million plus wired to London on behalf of Albert after the fact and did not ratify the act immediately. In fact, he was annoyed when he first learned that the money was sent. Clearly then, Mr. Hunt was not concerned at all about any of the dilemmas when the transfer was made or when he first learned of it. In light of the circumstances, we do not believe any of the post-Silver Thursday "dilemmas" served as an impetus to the transfers. We understand petitioners' argument as to why Mr. Hunt made the payments, and even assuming the transfers of funds were ordinary and necessary, we do not find that these transfers of funds are deductible under section 212(2). Petitioners have *542 presented us with a whole list of possibilities to justify the transfers. However, possibilities are not enough to prove that BunkerHunt's motive in making the transfers on and after March 17, 1980, was for the maintenance, conservation or management of his own silver assets. In summary, the transfers made from January 24, 1980, up until, and including Friday, March 14, 1980, are bona fide loans. The transfers made on and after Monday, March 17, 1980, are not bona fide loans, nor are they expenses deductible under section 212. Since petitioners have failed to argue any other treatment for the transfers made on or after March 17, 1980, we determine those transfers made on and after March 17, 1980, totalling $ 57,729,049.86 are gifts. The amounts which were gifts are subject to gift tax, Mr. and Mrs. Hunt are not entitled to any deduction for those amounts, and the children have no income from the transfers. We need only be concerned from this point forward with the transfers which were loans, i.e., those made up to and including March 14, 1980. We must decide whether Mr. and Mrs. Hunt meet all of the requirements of section 166 and are entitled to the bad debt deduction for *543 the children's failure to repay those amounts. 4. Bad DebtDeduction
Section 166(a) provides a deduction for any debt which becomes worthless during the taxable year. For noncorporate taxpayers, a nonbusiness bad debt is treated as a short-term capital loss. Only a bona fide debt qualifies for purposes of section 166. Sec. 1.166-1(c), Income Tax Regs. A bona fide debt is a debt which arises from a debtor/creditor relationship based upon a valid and enforceable obligation to repay a fixed or determinable sum of money. Sec. 1.166-1(c), Income Tax Regs.
We have already determined that $ 107,690,000 of the transfers from Mr. Hunt to the children qualified as bona fide debts. Therefore, in order to be entitled to a bad debt deduction Mr. and Mrs. Hunt need to prove that the debts, to the extent not repaid, became totally worthless during 1980. Since the parties agree that these debts are not "business" debts, Mr. and Mrs. Hunt are not entitled to a bad debt deduction unless the debts owed by each child are totally worthless. *544 Sec. 1.166-2(b), Income Tax Regs.
Whether and when a debt becomes worthless is determined on all the facts and circumstances including the value of the collateral, if any, securing the debt and the financial condition of the debtor. Sec. 1.166-2(a), Income Tax Regs. Moreover, when the attendant circumstances indicate that a debt is worthless and uncollectible and that in all probability, legal action to enforce the payment would not result in satisfaction, the taxpayer has met his burden of proving worthlessness. Sec. 1.166-2(b), Income Tax Regs.
A debt is considered worthless only when it can reasonably be expected that the debt is without possibility of future payment. Hawkins v. Commissioner, 20 T.C. 1069 (1953). If a taxpayer can demonstrate that the debtor is insolvent, this is some evidence that the debt is worthless. See, e.g., Gorman Lumber Sales Co. v. Commissioner, 18 T.C. 746 (1952); *545 Mellan v. Commissioner, T.C. Memo. 1968-94. Insolvency means that the debtor's liabilities exceed his assets. Insolvency is not, however, conclusive evidence that a bona fide debt is worthless. Cimarron Trust Estate v. Commissioner, 59 T.C. 195 (1972). We must also consider the debtor's potential for improving his financial position. Dustin v. Commissioner, 53 T.C. 491, 502 (1969), affd. 467 F.2d 47 (9th Cir. 1972). In sum, numerous other factors may also be evidence of whether or not a debt is worthless. Petitioners contend that the debts in these cases had value during the first part of 1980, that the debts became worthless on March 27, 1980, and that any hope of recovery was extinguished after the yearend settlements which rendered the children hopelessly insolvent. Respondent counters that BunkerHunt never really attempted to collect the loan amounts, i.e., that the yearend transactions lacked economic substance, and that the debts were not worthless in 1980. Respondent also claims that the fact that Mary, Betsy and Houston were beneficiaries of the Lyda Hunt-Bunker trust and that they and their spouses *546 were young, intelligent, had bright futures and high earning potential preclude the debts from being worthless. We find after examination of all the attendant facts and circumstances that the debts did become worthless in 1980. The facts of these cases indicate that on March 27, 1980, all of the children's silver and gold positions were liquidated, leaving the children hopelessly insolvent. That is, on March 27, 1980, the Hunt children's bona fide liabilities far exceeded their assets. Furthermore, after their commodity positions were closed out, the children had no prospect of earning anywhere close to the sum of their liabilities in the near future. Further, on December 28 or 29, 1980, BunkerHunt made demand on the children for repayment of the debts. These events establish that he had no realistic expectation of repayment after 1980. Respondent initially contends that the demand for payment at yearend lacked economic substance and that it was merely a plan devised by Mr. Hunt's tax lawyers to give the requisite form to support a nonbusiness bad debt deduction for Mr. and Mrs. Hunt while at the same time avoiding any gift tax liability. We disagree. First, the reality *547 is that BunkerHunt had over $ 97 million in loans outstanding to his children in December 1980 and the children would not be able to repay the loans. The fact that a tax lawyer advised him to demand repayment before yearend does not mean that the demand and partial payment lacked economic substance. Mr. Hunt's tax lawyer correctly advised that if Mr. Hunt did not attempt to collect the debt before the statute of limitations ran, he would be deemed to have made a gift when the statute of limitations did run. There is nothing inherently wrong with Mr. Hunt's seeking advice on the best way to handle a loan in order to maximize tax benefits and minimize harm. Gregory v. Helvering, 293 U.S. 465, 469 (1935). Tax advice cannot change any of the underlying facts. This advice merely took account of all the facts, recognized there was no real prospect of repayment and correctly informed Mr. Hunt that the appropriate course of action was to demand payment and write-off the loans to the extent not repaid. Initially, BunkerHunt was not a willing participant in this plan. He was extremely reluctant to forgive the debt. The Court has no doubt that Mr. Hunt would have *548 much preferred repayment over the ability to claim a bad debt deduction. The bottom line is that we do not consider the transfer of over $ 5 million dollars in property from the children to Mr. and Mrs. Hunt in satisfaction of their debts to lack economic substance. Respondent constantly asserted during the course of the trial that the children transferred these assets only because they were somehow assured that the payment would be made up to them at a later time. We find no support for this assertion. There is no evidence that any of the property was ever returned to the children. Respondent next argues that petitioners did not establish that each of the loans became worthless in 1980 as to each of the children. Respondent states that petitioners did not offer proof that the loans had been analyzed to ascertain their value, that no proof was offered as to an identifiable event which occurred and would form the basis of reasonable grounds for abandoning hope of any recovery, and that no proof was offered to establish that Mr. Hunt had analyzed the age, health, educational status, earning capacity and income of each child. First, it is ludicrous to claim that Mr. Hunt had *549 to conduct an analysis of the debtors' ages, health, educational status and earning capacity. He was and is their father. He was well aware of how old each of the children was, their educational level, their health, earning potential, and through HEC, their income. Therefore, this argument is meritless. Second, petitioners did establish the identifiable events which formed the basis of Mr. Hunt's belief that there was no hope of recovery. On March 27, 1980, all of the children's silver and gold positions were liquidated. These positions were the only likely source of any recovery on the notes. Once the positions were liquidated, it is questionable whether Mr. Hunt could have expected any recovery. After he demanded payment and the children transferred a majority of their assets to him, Mr. Hunt no longer had any realistic expectation of repayment. Third, no analysis of the loans' value was necessary. It was quite obvious then, as it is now, even accounting for the children's earning potential, that none of the children could ever hope to completely pay off even the interest that was accruing, never mind any portion of the principal. Under these circumstances the debts *550 were worthless after the payments made on December 31, 1980. Respondent also argues that even giving effect to the yearend transfers, the debts were not wholly worthless during 1980. Respondent states that the children's assets exceeded their liabilities at yearend and also argues that Mr. Hunt should have expected their assets to increase because of future earnings and trust distributions. We do not agree that Mr. Hunt could have reasonably expected repayment of the debts based upon the income of the children. Even though the income levels of the children could be expected to increase over time, it is not reasonable to expect that their incomes would increase significantly enough to pay off any of the debts. We also think it unreasonable to assume the children would have gotten trust distributions large enough to pay off a portion of the debt. Respondent assumes that BunkerHunt controlled the Lyda Hunt-Bunker trust or had sufficient influence over the trustees to know the amount and the time of distributions. The evidence does not persuade us of the truth of this assumption. Moreover, we agree with petitioners that the trust was a spendthrift trust and could not be reached *551 by any of the children's creditors. The Last Will and Testament of Lyda Hunt, which created the Lyda Hunt-Bunker Trust, provides in paragraph F: The Beneficiaries may receive from time to time during the life of said Trusts, such portions of the net profits accruing from time to time to said Trusts, and such portion of the net increment in corpus accruing from time to time to said Trusts, as the Trustees may see fit to pay over and deliver to said Beneficiaries. * * * Such distributions may be made at any time during the year, either before or after the final determination of net profits or net increment in corpus. No duty is imposed upon the Trustees to make such distributions of net profits or net increment in corpus, but the power is conferred upon them so to do, and in exercising this discretion said Trustees shall give full consideration to the interests of the Beneficiaries and the respective Trusts to the end that the Beneficiaries have sufficient funds from this source if needed in order to maintain the standard of living to which each is accustomed. Subject to the above, the amount of any such payment of net profits, or net increment in corpus to the Beneficiaries by *552 the Trustees shall be conclusive upon such Beneficiaries and upon anyone claiming by, through or under them; and no ownership or right of possession, control or transfer of any such net profits or net increment in corpus shall vest in any Beneficiary until such net profits or net increment in corpus shall have been actually paid over to said Beneficiary by said Trustees. All sums payable to any Beneficiary under the Trusts herein established shall be free and clear of the debts, contracts, alienations and anticipations of the Beneficiaries, and free and clear of all liability for levies and attachments and proceedings of whatsoever kind at law or in equity. [Emphasis added.] Under Texas Law, Tex. Prop. Code Ann. sec. 112.035 (Vernon 1984), a spendthrift trust is created if the terms of the trust provide either of the following terms: (a) A settlor may provide in the terms of the trust that the interest of a beneficiary in the income or in the principal or in both may not be voluntarily or involuntarily transferred before payment or delivery of the interest to the beneficiary *553 by the trustee. (b) A declaration in a trust instrument that the interest of a beneficiary shall be held subject to a "spendthrift trust" is sufficient to restrain voluntary or involuntary alienation of the interest by a beneficiary to the maximum extent permitted by this subtitle. We find that the terms of the trust prevent the transfer of income or principal by the beneficiaries before payment or delivery. In addition, the history of trust distributions up through 1980 does not indicate a pattern of frequent or large distributions. In fact, through 1980, when Bunker Hunt determined that the loans were worthless, the following distributions were made: Year
Houston
Betsy
Mary
1958-1973
-0-
-0-
-0-
1974
50,000
50,000
50,000
1975
-0-
-0-
-0-
1976
50,000
50,000
50,000
1977
25,000
25,000
25,000
1978
-0-
-0-
-0-
1979
-0-
-0-
-0-
1980
225,000
225,000
225,000
Therefore, we do not believe the children's interest in the trust was sufficient to preclude the debts from being worthless in 1980. In 1980 Houston borrowed $ 4 million from his father (the other transfers were gifts). At yearend he transferred $ 1,380,066.25 in satisfaction *554 of that debt. Mary and Albert had borrowed $ 45,890,000. They had repaid $ 1 million of principal leaving $ 44,890,000 of debt outstanding at yearend. On December 31, 1980, they transferred $ 2,687,448.30 to Mr. Hunt. Similarly, Betsy and Tom Curnes had borrowed $ 57,800,000 during 1980. They had paid $ 10,000,000 in principal plus $ 350,300.67 in interest. The Curneses owed Mr. Hunt $ 47,800,000 in principal at yearend. They transferred $ 1,408,440.23 to him on December 31, 1980. Thus the following amounts were still outstanding on December 31, 1980: Houston  $ 2,619,933.75
Mary & Albert  42,202,551.70
Betsy & Tom  46,391,589.77
That being the case, the children would owe interest in excess of the following amounts annually: Houston  $ 400,000
Mary & Albert  6,436,000
Betsy & Tom  7,075,000
Even if the children could have made partial payments of interest, such payments would not preclude a debt from being a bad debt within the meaning of section 166. It is obvious that even if Mr. Hunt knew in advance that his children would receive substantial distributions from the Lyda Hunt-Bunker trust, he still had *555 no reasonable basis to believe, in 1980, that any portion of the principal would be repaid. Since there was no hope that any of the principal could be repaid in 1980, the debts were worthless. 5. Relief of Indebtedness -- Income or Gift? The next issue to decide is whether any of the children had income as a result of the cancellation of the indebtedness on December 31, 1980; or whether Mr. and Mrs. Hunt made a gift when they forgave a majority of the indebtedness. It is well established that income is recognized when debt is cancelled. United States v. Kirby Lumber Co., 284 U.S. 1 (1931). Section 61(a)(12) also provides that income includes income from the discharge of indebtedness. Generally, the amount of income is equal to the difference between the amount due on the obligation and the amount paid. If, however, the debtor is insolvent at and immediately after the debt is discharged for less than the full amount due, he does not realize income. Sec. 108; *556 Dallas Transfer and Terminal Warehouse Co. v. Commissioner, 70 F.2d 95 (5th Cir. 1934); Quinn v. Commissioner, 31 B.T.A. 142 (1934). The reason for the exception is that no part of the debtor's assets have been "freed up" by the debt cancellation so there is no increase in net worth. On the other hand, if the debtor is made solvent by the discharge, cancellation of indebtedness income is realized to the extent the debtor's assets exceed his liabilities. Haden Co. v. Commissioner, 118 F.2d 285 (5th Cir. 1941), cert. denied 314 U.S. 622 (1941); Lakeland Grocery Co. v. Commissioner, 36 B.T.A. 289 (1937). Property which is exempt from the claims of creditors is not included in determining the fair market value of the taxpayer's assets since the cancellation of indebtedness does not release those assets from the creditors' claims. Fifth Avenue-Fourteenth Street Corp. v. Commissioner, 147 F.2d 453 (2d Cir. 1944); Cole v. Commissioner, 42 B.T.A. 1110 (1940). The taxpayer/debtor *557 does not need to undergo formal bankruptcy to establish insolvency. It is sufficient if the transfer of assets in exchange for the discharge is "similar to what occurs in an insolvency or bankruptcy proceeding." Dallas Transfer & Terminal Warehouse Co. v. Commissioner, supra at 96. See also Rev. Rul. 58-600, 1958-2 C.B. 29. The question we must answer is whether the children were insolvent after the transfers on December 31, 1980. In making our determination, we must determine which assets, if any, were exempt from the claims of creditors, which assets were actually transferred on December 31, 1980, and to what extent the value of the assets the children retained exceeded the exempt assets. a. Exempt Assets
We determine which assets are exempt from the claims of creditors by looking to Texas Law. Cole v. Commissioner, supra at 1113. Petitioners presented the expert testimony of Professor Elizabeth Warren on the issue of which assets are exempt from claims of creditors. Her testimony, however, was more concerned with the issue of whether Mr. and Mrs. Hunt received more in the yearend transfers than they would have *558 received had the children declared bankruptcy. To a great extent, whether Mr. and Mrs. Hunt received more from the yearend transfers than they would have through bankruptcy proceedings is irrelevant. Our concern is not what Mr. and Mrs. Hunt received, but what the children retained. Professor Warren's report is probative to the extent it indicates that the children's liabilities exceeded their assets, excluding those assets exempt from the claims of creditors. The first question to answer, however, is whether in determining which assets are exempt from the claims of creditors in Texas, we consider, as Professor Warren did, those assets which would be exempt from the claims of creditors under Federal Bankruptcy law. Texas is a somewhat unique state in that under Texas law, when a debtor files for bankruptcy he has the option of claiming either Federal exemptions or state exemptions. Additionally in Texas, unlike other jurisdictions, a married couple can "stack" their exemptions. That is, one spouse can claim the protection of Texas exemptions while the other spouse claims the protection of Federal exemptions. In preparing her report, Professor Warren concluded that, if the *559 Hunt children had filed for bankruptcy it would have been beneficial for the Curneses and Huddlestons to "stack" their exemptions. She also concluded that Houston would gain a greater benefit from claiming Federal exemptions over state exemptions. The problem we are faced with, however, is whether in the absence of actually filing for bankruptcy under Title 11, the Hunt children are entitled to claim or stack Federal exemptions under Texas law. See 11 U.S.C. sec. 522 (1982); In the Matter of Cannady, 653 F.2d 210 (5th Cir. 1981) (where the court found the legislative history behind the Bankruptcy Code demonstrated that Congress intended to allow each debtor in a joint proceeding to choose the Federal exemptions regardless of his or her spouse's choice of a family exemption under state law, unless and until state law precludes such a result.) We believe that, absent the actual filing for bankruptcy, Texas law would not allow the Hunt children the option of Federal bankruptcy exemptions. Since state law controls the determination of insolvency, *560 we conclude, for the Hunt children, that the determination of insolvency must be made only excluding those assets exempt from the claims of creditors under Texas law. While this conclusion may lead to different results for taxpayers who actually file for bankruptcy and those who do not, we note that different answers also result from those debtors who file for bankruptcy and reside in different states. The reason for the lack of consistency is twofold. First, the Federal exemptions must be elected. Second, many states do not allow their residents to choose Federal exemptions over those offered by the state. [10] Therefore, no matter what path we choose today, we still cannot guarantee nationwide uniformity in determining which assets are exempt from the claims of creditors when making a determination of solvency. Furthermore, the correctness of our result is reinforced by the language of section 108. Section 108(a)(1) provides *561 that gross income does not include any amount which would be includible in income by reason of the discharge of indebtedness if the discharge occurs in a Title 11 case, or the discharge occurs when the taxpayer is insolvent. Section 108(a)(2) further provides that the exclusions from income which occur in a Title 11 case do not apply when the discharge occurs from insolvency outside of a Title 11 proceeding. Thus, Congress was aware that different results would occur when a taxpayer actually filed for bankruptcy versus when an insolvent taxpayer did not. Furthermore, section 108(d)(2) and (3) set forth the definitions of "Title 11 case" and "insolvent." A Title 11 case is "a case under Title 11 of the United States Code (relating to bankruptcy), but only if the taxpayer is under the jurisdiction of the court in such case and the discharge of indebtedness is granted by the court or is pursuant to a plan approved by the court." Sec. 108(d)(2). Insolvent is defined as "the excess of liabilities over the fair market value of assets. With respect to any discharge, whether or not the taxpayer *562 is insolvent, and the amount by the taxpayer is insolvent, shall be determined on the basis of the taxpayer's assets and liabilities immediately before the discharge." Thus, Congress intended and we uphold different treatment for those taxpayers who actually file a bankruptcy petition under Title 11 and those who do not. In these cases the Hunt children did not file for bankruptcy. Therefore, whether they are insolvent is determined by exempting only those assets which are exempt from the claims of creditors under state law. Under Texas law the homestead and certain personal property is exempt from the claims of creditors. Tex. Rev. Civ. Stat. arts. 3833 and 3836 (West Supp. 1981). The amount of the homestead exemption is limited to the improvements on the land plus $ 10,000 for the underlying land. Tex. Rev. Civ. Stat. art. 3833 (West Supp. 1981). The $ 10,000 limit is determined at the time the homestead begins. In essence, this provision allows the individual to keep appreciation in value for the land in the same proportion $ 10,000 bears to the total value of the land at the *563 time of purchase. For purposes of determining the value of the Huddlestons and Curneses homestead exemptions, we accept the calculations and conclusions of Professor Warren. According to her report, the Huddlestons purchased their home in 1978. The home was appraised at the end of 1980 for $ 161,000. The improvements on the home were valued at $ 81,000 and are completely exempt. The Huddlestons are also entitled to an additional exemption of $ 10,000 for the land underlying the home. The remainder of the value of the land, which normally would be subject to the claims of creditors, is not subject here because the Huddlestons had a mortgage of $ 88,841 outstanding on their home as of December 30, 1980. Texas law requires that the amount of the outstanding mortgage be deducted first from the otherwise nonexempt portion of the homestead, in this case $ 70,000. Since the amount of the mortgage is greater than the nonexempt portion of the homestead, no part of the land is subject to claims of creditors. Furthermore, the amount of the homestead exemption is reduced by the remaining amount of the mortgage. Thus, the amount of the homestead exemption for the Huddlestons is $ 68,016.84. *564 Applying the same analysis to the Curneses, we find that they purchased their home for cash in 1980 and it had an appraised value of $ 362,000 on December 30, 1980. The estimated value of the improvements was $ 177,000 and that amount is included in the homestead exemption. The Curneses are also entitled to include $ 10,000 for the value of the land. The remaining value of the land, $ 175,000, would be subject to the claims of creditors. Thus, the Curneses homestead exemption is limited to $ 187,000. [11]
*565 The exemptions for personal property are limited to $ 15,000 for an adult and $ 30,000 for a family (or two adults). Tex. Rev. Civ. Stat. art. 3836 (West Supp. 1981). It is clear that the Huddlestons and the Curneses had property eligible for the exemption far in excess of the statutory limits. Thus, each family is entitled to exempt $ 30,000 in property. Houston is entitled to exempt assets totalling $ 6,100 under Texas law. He is entitled to $ 1,000 for his personal effects and $ 5,100 for the value of his automobile. Petitioners presented Houston's exemptions based only on Federal bankruptcy laws. Houston may have been entitled to other exemptions under Texas law, but petitioners failed to present detailed enough information for the Court to determine to what extent, if any, Houston's other property was exempt. [12] We simply conclude that the Huddlestons would have had a total exemption of $ 98,016.84 ($ 68,016.84 + $ 30,000), that the Curneses would have a total exemption of $ 217,000 ($ 187,00 + $ 30,000) and Houston would have a total exemption of $ 6,100 for his personal property. *566 b. The Transfer of Assets
On December 31, 1980, the children transferred substantially all of their assets to Bunker Hunt. We must determine what they retained after the transfer and what their other existing liabilities were in order to determine whether or not the Hunt children were insolvent at yearend. There are only minor differences in the values assigned to the Hunt children's assets and liabilities by petitioners and respondent. We determine the following represents the assets and liabilities of the children giving full effect to the transfers at yearend. Houston
Mary & Albert Betsy & Tom  Total assets
$ 450,921.96 * $ 1,001,818.86 $ 814,025.70 Federal income
tax liability
(216,738.68)
(54,622.18)
(149,945.20)
paid December 31, 1980
Other secured
and unsecured
liabilities
(230,072.73) ** (919,997.33)
(414,204.80)
Exempt assets
(6,100.00)
(98,016.84)
(217,000.00)
Extent of
solvency on
December 31,
1980
(1,989.45)
(70,817.49)
32,875.70 *567 We give no value to the 3-H receivable the Huddlestons owned at year end and which they transferred in satisfaction of the "$ 500,000" debt to Albert's father in 1981. We also find this "$ 500,000 debt" owed to Albert's parents was not genuine. The debt was collateralized by a certificate of deposit which already collateralized a real estate project both Albert and his father were involved in. Moreover, the debt was subsequently cancelled with the 3-H receivable mentioned above, which had questionable, if any, value. We also find that the Curneses were solvent to the extent of $ 32,875.70. The Curneses' solvency is largely attributable to the fact that their entire homestead was not exempt from the claims of creditors under Texas law. We find that all of the assets were effectively transferred to Mr. and Mrs. Hunt by yearend. This is true even though the actual items may not have been transferred until after the close of the year. All of the documents were signed by December 31, 1980, thereby effectively passing title to Mr. and Mrs. Hunt. The Curneses transferred a $ 200,000 Eurodollar deposit on December 31, 1980. When the Eurodollar deposit matured on January 5, 1981, the *568 Curneses realized they had a $ 450,000 Eurodollar deposit rather than a $ 200,000 deposit. In accordance with their intent on December 31, 1980, to transfer all of their assets to Mr. and Mrs. Hunt, the Curneses delivered to Bunker Hunt the $ 450,000 Eurodollar deposit plus the interest which had accrued. Thus, we give the transfer full effect and find, as stated above, the Curneses were made solvent only to the extent of $ 32,875.70. We do not find that Mr. and Mrs. Hunt made a yearend gift to the Curneses; rather the Curneses must include the amount of their solvency at yearend in income. [13]
Accrual of Interest
Section 1.451-1(a), Income Tax Regs., provides that under an accrual method of accounting, income is includible in gross income when *569 all events have occurred that fix the right to receive such income and the amounts thereof can be determined with reasonable certainty. The right to receive interest income becomes fixed ratably over the period of a loan, so long as the requirements of the all-events test have been met. A fixed right to a determinable amount does not require accrual, however, if the income item is uncollectible when the right to receive income arises. See Jones Lumber Co. v. Commissioner, 404 F.2d 764 (6th Cir. 1968). When an item is properly accrued and subsequently becomes uncollectible, a taxpayer's remedy is by way of a deduction rather than the elimination of the accrual, even if the item is accrued and becomes uncollectible during the same taxable year. Spring City Foundry Co. v. Commissioner, 292 U.S. 182 (1934). We find that interest properly accrued on the loans through March 14, 1980. Since the loans were worthless at yearend, a deduction is allowed under section 166 for the accrued interest to the extent it is uncollectible. To reflect the foregoing and concessions, Decisions will be entered under Rule 155 in docket Nos. 758-85, 760-85, 761-85, 762-85, 10239-87 and *570 10240-87. Decisions will be entered for petitioners in docket Nos. 759-85 and 763-85. Footnotes
1. The following cases were consolidated for trial, briefing and opinion: Albert D. and Mary H. Huddleston, docket No. 759-85; N. B. Hunt, docket No. 760-85; N. B. and Caroline L. Hunt, docket No. 761-85; Thomas and Elizabeth H. Curnes, docket No. 762-85; Houston B. Hunt, docket No. 763-85; N. B. Hunt, docket No. 10239-87; and C. L. Hunt, docket No. 10240-87.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the 1980 taxable year. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. The following types of transactions were excepted from the trade-for-liquidation-only rule: (1) If the transaction was done solely for the purpose of effecting delivery; (a) new sales; or (b) the moving of any pre-existing short position backward into a nearer maturity so long as all steps necessary to accomplish such moving backward were done within the same bracket period. (2) Trading in the spot month so long as: (a) such spot position was switched, on the same trading day, into a different maturity which resulted in an offset against a pre-existing position; (b) the sole purpose of the transaction in the spot month was to liquidate a pre-existing position; and (c) such trading did not result in an increase in net position. (3) Exchange for physicals so long as the transaction, when aggregated with permissible transactions under paragraph 4 of this Resolution lowered the open interest and either party thereto that transferred a futures position did not thereafter reinstate all or any position of the futures position so transferred. (4) Moving any pre-existing position forward into a more distant maturity so long as all steps necessary to accomplish such moving forward were done within the same bracket period. (COMEX Notice to Members #80-17, January 22, 1980, and Resolutions for Liquidation Only Trading in Silver, January 21, 1980.↩
4. All of the Hunt children owed Federal income taxes for 1980. Houston Hunt owed $ 216,859.23 (arising in large part from the interest income he earned during the year), the Curneses owed $ 149,945.20 (arising in large part from the sale of T-bills and interest income earned) and the Huddlestons owed $ 54,622.18 (arising in large part from dividends and interest income earned).↩
5. Petitioners originally argued that all↩ the transfers made were bona fide loans. They have apparently conceded that sums transferred after March 27, 1980, were not bona fide loans.
6. Sigmund Freud may have said it better. "Sometimes a cigar is just a cigar." J. Bartlett, Familiar Quotes 679 (1980).↩
7. ↩
Betsy
Mary
Albert
Houston
1/24/80  $ 4,500,000
1/25/80  9,300,000
1/28/80  10,700,000
1/29/80  2,200,000
19,355,000
1/30/80  3,865,000
2/1/80  12,600,000
2/5/80  1,200,000
10,070,000
2/20/80  2,600,000
2/25/80  3,900,000
2/27/80  1,400,000
3/7/80  2,350,000
3/10/80  3,800,000
3/11/80  8,050,000
3/17/80  800,000
3/14/80  7,000,000
4,000,000
57,800,000
12,600,000
33,290,000
4,000,000
8. Respondent's reliance on Estate of Berkman v. Commissioner, T.C. Memo. 1979-46↩, is misplaced. Memorandum Opinions of this Court are not authority. In any event, the facts of that case are distinguishable.
9. This is an alternative argument as to transfers made between March 17, 1980, and March 27, 1980. Petitioners' primary contention is that those transfers constitute bona fide loans. We note that transfers were not made either on Saturday, March 15, 1980, or on Sunday, March 16, 1980. Therefore, although we found bona fide loans were made up to and including March 14, 1980, petitioner's argument as to deductibility under sec. 212↩ applies only to transfers on or after Monday, March 17, 1980.
10. There are currently 36 states which do not allow debtors to choose Federal exemptions. 3 Collier on Bankruptcy par. 522.02↩ n. 4a (15th ed. 1989).
11. Petitioners argue that the statute limiting the exemption for the land underlying the home to $ 10,000 was retroactively repealed in 1984. Tex. Code Ann. sec. 41.001 (Vernon 1984). Therefore no part of the home was subject to the claims of creditors or that it is doubtful the home would be sold to reach any of the excess value. We disagree. First, this law merely gave the benefit of no dollar limit to all homesteaders after the date of its enactment, regardless of when the homestead was created. It did not retroactively give rights to persons whose property was subject to the claims of creditors in 1980. Second, the clear language of the statute limits the exemption to $ 10,000. Petitioners have not demonstrated that the limit would not be enforced.↩
12. In view of our ultimate finding that Houston was insolvent at yearend, this determination is not detrimental in determining his tax liability.↩
*. We do not accept that the 3-H receivable had any value on December 31, 1980. ** We find the "loan" from Albert's parents to Albert and Mary did not create genuine indebtedness.↩
13. In light of the decision that the relief of indebtedness is income to the children to the extent of their solvency, and that no gift was made, we need not decide whether the statute of limitations barred respondent from issuing a notice of deficiency for the gift tax period ending December 31, 1980.↩